The motion for new trial was properly overruled.

Judgment affirmed.

(63 South. 169.)

No. 19,964.

STATE v. TURNER et al.

(June 30, 1913.)

*(Syllabus by the Court.)*

1. JURY (§ 33*)—JURY COMMISSIONERS—VENIRE—RACE—DISCRIMINATION.

Jury commissioners are expected, and the law makes it their duty, to look beyond the apparent and merely technical qualifications of the persons whom they select for service on juries and find whether they possess the real qualifications. They are to select some men for such service, and to exclude others, not because they are white, or black, but because they are "competent" men for that service, and "good and true," or because they are not competent for that service and are not good and true, and each commissioner is to determine as to the qualifications of the juror, whom he concurs with the other commissioners in selecting, upon his individual responsibility and according to his conscience and best judgment. If the commissioner is a white man, it may be assumed, in this part of the country, that his associates are white men, and where, as is not uncommon, the negroes in his parish live in settlements to themselves, his acquaintance among them may be extremely limited. Under such circumstances it would be inexcusable, if, in the exercise of his functions as jury commissioner, he should pass over white men whom he knew to be competent for jury service, good and true, in order to select jurors from among negroes, or from among other white men of whose qualifications he was ignorant, or whom he knew to be incompetent, though, apparently and technically qualified. And what is true of one commissioner is true of all, so that, with a commission composed of white men, the probabilities are that, in the intelligent, proper, and legal exercise of a plain duty, they will select white jurors, rather than colored, not by way of discrimination against the latter on account of their color, but because they are likely to know the white men better, are likely to believe that some of them are better qualified to serve as jurors than any negroes whom they know, are bound, upon their oaths and their consciences and according to their lights, to select the men whom they believe to be the better qualified, and are not bound to select men whose qualifications they are ignorant or doubtful of or believe to be inferior to those of others whom they have the opportunity to select.

[Ed. Note.—For other cases, see Jury, Cent. Dig. §§ 226–232; Dec. Dig. § 33.*]

*(Additional Syllabus by Editorial Staff.)*

2. CRIMINAL LAW (§ 608*)—DENIAL OF CONTINUANCE.

The continuance of a criminal case to secure the attendance of a witness who had not been subpœnaed was properly denied, where there was no affidavit to support the motion and no legal cause shown why the continuance should be granted, though there was a statement noted by the stenographer that defendant desired to secure the testimony of the witness to prove certain alleged facts.

[Ed. Note.—For other cases, see Criminal Law, Cent. Dig. §§ 1350, 1364–1368; Dec. Dig. § 608.*]

Appeal from Fifth Judicial District Court, Parish of Jackson; Cas Moss, Judge.

Jake Turner and Joe Turner were convicted of shooting another person with a dangerous weapon, and Joe Turner, alone, appeals. Affirmed.

William M. Wallace, of Winnfield, for appellant. R. G. Pleasant, Atty. Gen., Julius T. Long, Dist. Atty., of Winnfield (G. A. Gondran, of Donaldsonville, of counsel), for the State.

MONROE, J. The two defendants were prosecuted upon a charge of willfully and maliciously shooting Sam McLain with a dangerous weapon, to wit, a shot gun, with

intent, then and there, to kill and murder the said Sam McLain.

They were both convicted of shooting, with intent to kill, and duly sentenced. Joe Turner, alone, has appealed.

[1] 1. Defendant reserved a bill of exception to the overruling of a motion to quash the general venire and the panel from which the petit jury was to be drawn; the grounds relied on, as supporting the motion, being:

That the jury commission failed, within 30 days after its appointment, to place the names of 300 persons, possessing the qualifications required of jurors, in the venire box, but, instead, drew from those placed there by former commissions the names of 30 persons to serve as jurors during the then term of the court. That the 300 names which have been placed in the box included the names of no colored persons, though 25 per cent. of the persons in the parish, possessing the qualifications of jurors, are colored, and that he, defendant, being colored, was thereby irreparably injured.

That, by common consent of the jury commissioners, only the names of white persons were put in the venire box, thereby unjustly discriminating against a colored person charged with crime, and particularly defendant.

It is not charged that there was any fraud in the alleged failure of the jury commission to put 300 names in the venire box, or that any injury to the defendant resulted therefrom. Moreover, the allegation as made is not sustained by the evidence. What the newly appointed commission did, within 30 days after its appointment, is recited in the procès verbal of its meeting, as follows (quoting in part):

"We, the members of the jury commission in and for said parish and state, * * * met at the office of the clerk of said court. * * * We having been duly notified to appear. * * * And we, the said commissioners, together with L. W. Ramsey, clerk of court and ex officio jury commissioner, * * * in the presence of J. M. Shows and G. E. Cox, two competent and disinterested witnesses, of lawful age and competent to read and write the English language, residents of the parish of Jackson, called for this purpose, proceeded, in accordance with law and especially with act No. 135 of * * * 1898, as amended by act No. 58 of 1904, and as further amended by act No. 155 of 1906 and by act No. 16 of 1906, and by act No. 23 of 1908, as well as according to the laws in such cases made and provided for the drawing of jurors as aforesaid, to examine the original venire and strike therefrom the names of such as have served, as well as the names of others on the list who are known to have died, removed from the parish, become exempt or disqualified to serve as jurors since their names were entered thereon, and the names of those who have died, removed, become exempt, or disqualified otherwise were taken by us from the general venire box, after which we, the jury commission, supplemented the original list and the ballots in the box with the names of the same number of good and competent men from the qualified jurors of the parish, as were taken from the box and erased from the list, making the number of the names in the general venire box and on the jury list the original standard of 300 competent, good, and true men to serve as grand and petit jurors; said names being as follows, to wit" (and then follow the names).

The testimony, outside of the procès verbal, shows that the names found in the box, which were left there, were so left because, like the new names that were put in, they were the names of men whom the commissioners considered competent jurors, and there was no reason why they should not be held to serve as such. Upon the showing so made we find no irregularity in the proceedings of the commission, since the law (Act. 58 of 1904) requires the commissioners, or a majority of them, to select, "from the persons qualified under this act to serve as jurors in their respective parishes, the names of 300 competent, good, and true men," and men already selected, because of the possession of the necessary qualifications, but who have not been called on to render service, do not become disqualified or exempt merely because of such selection.

There was some testimony offered on behalf of defendant for the purpose of showing that the jury commissions of Jackson

parish have for years discriminated in favor of white jurors, to such an extent in fact that no colored men have been selected to serve in that capacity. The judge properly excluded the testimony relating to what may have been done prior to 1912, and the testimony as to what was done in that year and in the selection in 1913 of the venire from which were drawn the petit jurors by whom defendant was tried fails to show any discrimination that was either unlawful, improper, or prejudicial to defendant. It is true that, according to the evidence, there were no negroes selected for jury service in either of the years mentioned; but the same evidence negatives the idea that there was any agreement or understanding among the commissioners that none should be selected. One of the commissioners who held office in 1912 testified that he did not think that negroes were competent for jury service, and, a new commission having been appointed in 1913, and having selected the jurors constituting the general venire of 300, and drawn the panel of petit jurors for the April term of the court, at which defendant was tried, one of the members called by defendant was asked whether the commission had selected any negroes, and he replied, "No, sir; they have not," and he gave further testimony as follows:

"Q. Does the commission consider negroes fit to serve as jurors in this parish? A. It has never been a question that has arisen with the present commission, that is, in my presence, while we were together, at least, and it has been a question that I have never thought of until this case came up. Q. Do you think any negro ought to serve as a juror in this parish? A. As long as we have got good, solid, competent white men to fill this position, I think it is not necessary to get out and make a special selection to get negroes. That is my opinion about it. Q. Then you believe that this is a white man's country, and the white man ought to rule? A. I do, in so far as his official duty, it is necessary. I don't believe in disbarring the negroes from home rights and privileges, as far as that is concerned, as a negro, at all. Q. I understand you then to say that you believe in treating him right and fair under the law?

A. I do; yes, sir. Q. And you think that is a duty that the white man owes to him to see that he gets what is his, is it not? A. I believe it is; yes, sir.

"Cross-examination. Q. (Did) you make any effort or attempt to exclude negroes from the list of jurors that you put in the box? A. None whatever; no, sir. Q. Did you hear any of the other commissioners, or the clerk, mention that negroes should be excluded? A. No, sir; that question never arose at all. * * * Q. About how many of the 300 men "(whose names were put into the general venire box)" do you suppose you are acquainted with—that you know their honesty and integrity? A. Well, I suppose at least two-thirds of them. Q. What kind of men are they, as compared with the other citizens, white citizens, of this parish? A. I consider them among the best that we have got in our parish. Q. In your opinion, do you believe that the present jury (panel) of 30 men, who have been drawn to serve at this term, would give a colored man a fair and impartial trial? A. I certainly do. Q. Have you, as jury commissioner, in any manner attempted to draw a juror who, you believe, would not give a colored man a fair and impartial trial? A. No, sir."

On redirect examination the witness was asked whether he had not made a certain statement in regard to negroes, as jurymen, and he replied:

"I might have said—I don't remember positively—I might have said something similar to this, that I saw no reason why, so long as there are good white men to sit on juries, we should get out and hunt up negroes, when we didn't know whether they were qualified or not. I might have made such a statement as that, but for me to say that, so long as I was jury commissioner, and there were white men to fill the positions as jurors, we would have white jurymen, or anything of that kind, I didn't say it; I don't care who said they understood it that way."

As we understand the testimony, there are about 1,600 white men in Jackson parish apparently qualified to serve on juries, and about 200 negroes, or it may be that the percentage of negroes so apparently qualified is somewhat greater. The jury commissioners are, however, expected, and the law makes it their duty, to look beyond the apparent and merely technical, and find the real, qualifications. They are to select some men for jury service, and to exclude others, not because they are white or black, but be-

cause they are competent men for that service, and good and true, or because they are not competent for that service, or are not good and true, and each commissioner is to determine as to the qualifications of the juror, whom he concurs with the other commissioners in selecting, upon his individual responsibility and according to his conscience and best judgment. If the commissioner is a white man, it may be assumed, in this part of the country, that his associates are white men, and where, as is not uncommon, the negroes in his parish live in settlements, to themselves, his acquaintance among them may be extremely limited. Under such circumstances it would be inexcusable if, in the exercise of his functions as jury commissioner, he should pass over white men whom he knew to be competent for jury service, good and true, in order to select jurors from among negroes, or from among other white men of whose qualifications he was ignorant, or whom he knew to be incompetent, though apparently and technically qualified. And what is true of one commissioner is true of all of them, so that, with a commission composed of white men, the probabilities are that, in the intelligent, legal, and proper exercise of a plain duty, they will select white jurors, rather than colored, not by way of discriminating against the latter on account of their color, but because they are likely to know the white men better, are likely to believe that some of them are better qualified to serve as jurors than any negroes whom they know, are bound, upon their oaths and their consciences, and according to their lights, to select the men whom they believe to be the better qualified, and are not bound to select men whose qualifications they are ignorant or doubtful of, or believe to be inferior to those of others whom they have the opportunity to select.

In this particular case the defendant, a colored man, is prosecuted for shooting a colored man, with intent to murder him, and, so far as we can see, and as appears from the record, he was as likely to get, and did get, as fair and impartial a trial before an all white jury as he would have had before an all colored, or a mixed, jury. There is not a syllable of evidence in the record to support the allegation of injury to defendant, contained in the motion to quash, and we find no reason to believe that any injury was sustained by him. The motion was therefore properly overruled. State v. Casey, 44 La. Ann. 971, 11 South. 583; State v. West, 116 La. 626, 40 South. 920; Bush v. Kentucky, 107 U. S. 110, 1 Sup. Ct. 625, 27 L. Ed. 354; State v. Thompson; 104 La. 167, 28 South. 882; State v. Baptiste, 105 La. 661, 30 South. 147; State v. Batson, 108 La. 479, 32 South. 478; State v. Sheppard, 115 La. 942, 40 South. 363; State v. Sturgeon, 127 La. 459, 53 South. 703.

[2] Defendant has included in the same bill with the questions thus considered an exception to the denial of an application made by him, that the hearing of the motion to quash, which had been taken up and proceeded with, be continued until the next day, in order to enable him to secure the attendance of a witness for whom a subpœna had been ordered only after the hearing had begun, and who had not been served. There was a statement, noted by the stenographer, that defendant desired to secure the testimony of the witness in order to prove certain alleged facts; but there was no affidavit, and no legal cause shown why the continuance should be granted. The application was therefore properly denied.

There is another bill in the record predicated on the averments, that the two defendants were tried and convicted together, and were called up for sentence at the same time, but that separate judgments were signed, the facts being that Jake Turner was recommended to the mercy of the court, and

was given a comparatively light sentence, after which Joe Turner was given a heavier sentence. This bill has not been pressed in this court, and shows no error to the prejudice of the defendant.

Judgment affirmed.