LAND, J.
The defendant, indicted for the m'urder of Henry Amato, was tried by jury, found guilty as charged, and sentenced to be hanged. He has appealed, and relies for the reversal of the verdict and sentence against him, upon the following bills of exceptions:
No. 1. Mrs. Henry Amato, widow of deceased, was asked by counsel for defendant the following question on cross-examination:
“Mrs. Amato, you have already testified about your five sisters being present and three brothers. Now, I ask you to please name each one present at your father’s house on the 4th day of July. But you have never yet told the names.”
The counsel for the state did not object to the question propounded to the witness, but to the statement of defendant’s counsel, added to the question, “But you have never yet told the names,” on the ground that such statement conveyed the intimation that witness had concealed the names. This objection was sustained by the court. The question was then properly propounded to witness, who gave the names to the jury. As the testimony was admitted, the bill is without any foundation.
No. 2. This bill was taken in connection with bill No. 1, and grows out of the colloquy between the court and counsel for thq state and counsel for defendant upon that occasion. After asking Mrs. Henry Amato the question on cross-examination as to the names of her sisters and brothers, counsel for defendant added to this question his own statement, “But you have never yet told the names.” Defendant’s counsel complains, that upon this occasion counsel for the state, requested the court to charge the jury to disregard any statement made by counsel for the defendant. If, such request was made, the court did not comply with it, but charged the jury in writing as follows:
“Gentlemen, any unsworn statement made by any counsel in this case, not supported by the testimony, is not to be considered by you as evidence.”
This charge applies to statements made by counsel for the state, as well as by counsel for defendant, contains no diserimi *575 nation whatever, and is a correct enunciation of the law.
This bill also contained an objection to a remark of the court in the presence of the jury. Counsel for the defendant objected to this special charge to the jury, which was delivered in writing, and, while making his 'objection, requested that the stenographer should be sent for, and, at this juncture, counsel for defendant contends that the court said, “I think I know something about the Constitution too.”
The statement made by the court, as shown by the note of evidence taken, is as follows:
“No, sir; absolutely. Here is what I said, when you objected to my writing that charge, you wanted the stenographer up here. When the counsel objected to the court taking the note, the court said: ‘All right; if you want the stenographer we will send for her and get her here; I think, though, I know a thing or two.’ That is what I said.”
These remarks of the court were neither comments on the law nor on ,the evidence, and we fail to appreciate in what way they could have prejudiced the accused before the jury.
No. 8. This bill was reserved to the ruling of the court, holding that the questions first propounded pn the examination in chief to Mrs. Jennie Guirlando by counsel for defendant as to the location of various objects on a map were leading and suggestive. This bill is without merit. The map is a very simple drawing, and is filed in evidence. Mrs. Guirlando, after the bill was reserved, without suggestion or assistance by counsel for defendant, pointed out the gate, the fence, the potato house, etc., as indicated on the map and her testimony went to the jury.
No. 4. This bill was reserved to the ruling of the court holding ^hat Mrs. Guirlando was competent to designate the various objects on this map, although she was not a map drawer, and that counsel for defendant should no.t first point out with a pencil each object on the map by name, and then ask the witness if that was the particular object already indicated by him. As the witness, after this ruling, did actually point but the various objects on the map in the presence of the jury, this complaint fails to show any reversible error.
No. 5. This bill relates to the third violation of the ruling of the court that the counsel for the defendant should hand the map to witness, and without suggestion or assistance from him the witness should be requested to point out the -various objects on the map, and this is what the witness finally did, as shown by her testimony in the note of evidence.' The ruling, if erroneous, was harmless error.
No. 6. Mrs. Angelina Nicolosi, the mother-in-law of the deceased, and the mother-in-law of the defendant, while being examined in chief as a witness, was asked the question:
“When was the first time Guirlando told her of the trouble with Amato, and the charge that Amato had raped her daughter?”
There was no objection to this question. The answer of the witness was: “Three days.” The witness was then asked what Guirlando told her. This question was ob-' jeeted -to. Counsel for defendant stated 'that— «
“The purpose of the testimony was to show that defendant did tell her, and she and the old man persuaded him to abandon the idea, and he decided to abandon the idea until something happened in the city of Independence.”
Then counsel for the state objected to the testimony, on the ground that it would be a self-serving declaration, and was not admissible in evidence. This objection was sustained by the trial judge for the reason, as shown by the per curiam of the bill of exceptions: “Defendant tried to get before the jury a self-serving declaration.”
*577 That this ruling is correct is fully sustained by .the following statement of the trial judge as to the facts of this case in assigning his reasons for overruling the motion for a new trial on the ground that the verdict was contrary to the law and the evidence:
“The following facts are not contested or disputed: First. The defendant came from Rockford, 111., to Independence, Tangipahoa parish, Louisiana, about July 10,1921, to marry Jennie Nicolosi, and married her on July 10, 1921, and a few days later returned with his bride to Rockford, Ill., where he resided with his wife. Second. Jennie Nicolosi was sister of the wife of Henry Amato, the man charged in the indictment to have been murdered. Third. That defendant returned to Independence from Rockford between the last of November 1921, and the 11th of December 1921, the day of the homicide, for the express purpose of killing Henry Amato.' Fourth. That until Saturday December 10th, Guirlando, defendant, did not meet, or attempt to meet, the deceased, nor visit him, although the father-in-law’s house was no great distance from that of the deceased. Fifth. That, on Saturday December 10th, Amato (the deceased) and his wife met Guirlando in Independence at his request. That the meeting was entirely friendly and with cordial greeting. Thai Guirlando accepted the invitation of the deceased and his wife to return with them to their home, two or three miles distant, and that the three, after purchasing some food and fruit, went in Amato’s vehicle to Amato’s house, when supper was prepared and eaten, all joining in the meal. That the defendant and the deceased slept together, in the same bed, after a jolly family reunion during the evening. Next morning, after breakfast together, the defendant and the deceased went to Independence in a wagon. After walking around together for quite a while, and after having purchased and' eaten fruit and so forth, they went into a cigar stand, where defendant treated deceased to a cigar. Upon coming out of the cigar stand, Amato, in company with the defendant, walked up to Fernand Anzalone, and asked him for a match. Anzalone, while giving him the match, was joking him about being able to smoke cigars and not having a match; at about the time the deceased, Amato, struck the match, and was lighting the cigar, the defendant began firing, continuing to shoot until liis pistol was empty. At this time, the deceased, begging, asked him not to shoot him any more, and saying, ‘Why you shoot me like this?’ sinking down, and lessening his hold on the post that stood on the edge of the banquette, and in a short time was dead. The state showed by witnesses that, in answer to this question, ‘Why you shoot me like this?’ the defendant, Guirlando, replied: ‘Deshonorato’ at the same time drawing a butcher knife, wrapped in paper, and attempted to get to the deceased, while he was lying on the ground. He was caught, and his arms pinioned from behind by Sam Oaredenalo, who testified that, when Guirlando attempted to get to the deceased with the knife, he, the defendant, said, ‘this is the knife that s-of a b- forced my wife with six days before I married her.’ The whole testimony in this case, including that of the defendant, showing that it was a premeditated, cold-blooded, treacherous murder. The defendant sought to excuse himself on the grounds that six days before his marriage Amato, the deceased, had raped his wife in a potato house on the premises of his father-in-law. The testimony of defendant, of his mother-in-law and his wife showed that on the 4th of July, the date defendant alleges that the rape was committed, he, the defendant, his father-in-law, mother-in-law, and' a youngpr brother-in-law went to Hammond to have the leg of his younger brother-in-law treated; that they were gone from 8 o’clock a. m. to about 5 o’clock p. m., leaving at' home defendant’s wife, who was then Jennie Nicolosi, Amato’s wife, who was her sister, and several children, ranging in age from 9 to 15 years old. Mrs. Guirlando (née Jennie Nicolosi) testified, as well as the wife of the deceased, that she and her sister, Mrs. Amato, were busy sewing on her trousseau all day; Mrs. Amato doing most of the cutting out of the garments, and Jennie sewing on the machine; the children being about the yard and the house during the day. Jennie Nicolosi, now Mrs. Guirlando, testified that about 5 o’clock p. m., she went to an outhouse, about 30 yards distant from the dwelling, to get potatoes; that upon entering the house, she found Amato, the deceased, in the potato house, and that he shut the door, and told her, after drawing a knife upon her, that, if she screamed, he would kill her. She further testified that she did scream loudly and struggled with him, until,he threw her on a table, and she fainted. She also said, at the time she went into the potato house, that her brothers and sisters, above mentioned, were playing about the yard, and a short distance from the house. • The jury evidently disregarded this testimony as to Jennie having been raped. I did not believe it, as it would have been impossible for it to have *579 occurred as described b.y Jennie Nicolosi, without the wife .of the deceased and all her brothers and sisters hearing her scream. The testimony showed that the defendant had a sister-in-law, a sister of his and of the deceased’s wife, who lived in Rockford, Ill., who carried on a regular correspondence with Mrs. Amato up until some time in the early fall; that old man Nicolosi, the father-in-law of deceased, Amato, and of defendant, made a visit to Rockford, Ill., where the defendant, his wife, and his other sister-in-law, whose name I do not recall, and her husband lived. That from the time he arrived in Rockford, Ill. (old man Nicolosi), the correspondence abruptly stopped and was never reopened. What the motive was was not shown; but I am satisfied that the motive did not grow out of the alleged rape of his wife, and that this story was a concocted one, with the view of escaping the consequences in this case. I am satisfied beyond all reasonable doubt that the defendant killed the deceased in cold blood and without justification or excuse. For the above reasons, the motion for a new trial was overruled. Robert S. Ellis, District Judge.”
The offer to prove by .the mother-in-law that defendant three days before the homicide, had been persuaded to abandon his intention to kill deceased because of the alleged rape committed on defendant’s fiancée, and had stated that he would not do so, is clearly an attempt 'to prove a self-serving declaration, in view of the facts detailed above by the trial judge, as the testimony shows, upon its face, that defendant displayed the butcher knife at the time of the killing, and charged the deceased with using this weapon to force his intended wife to submission, the defendant at the time being armed with a pistol and the butcher knife, with which he attempted to assault the deceased after he was shot down.
This proffered testimony in our opinion was a pure fabrication. If it had been admitted, it would have been contradicted by the facts surrounding the homicide, and, in addition to this, would have proven malice aforethought, as it would have shown conclusively that defendant was aware of the alleged outrage committed by Amato upon his future wife, at least three days before the actual killing, thereby excluding all possibility of the act having been committed in the heat of passion, and reducing the homicide to the grade of manslaughter.
In the case of State v. Kinchen, 126 La. 48, 52 South. 188, we said:
“The defendant next complains that he was not allowed to prove that, on the day of the murder, he had said to Garfield Hinchen that he [defendant] did not wish any of the Brelands or Averetts, or any of their kindred, harmed. The purpose was to show that the defendant had repented, and had countermanded the counsels theretofore given by him. The evidence was ruled out as being a mere self-serving declaration.. * * * And, moreover, this proffered evidence impresses us, as it did the trial judge, as being more in the nature of a self-serving declaration than a bona fide countermand. True, the evidence might tend to discúlpate the defendant by showing absence of malice on his part, but it is not for that reason any the less a self-serving declaration, find inadmissible. ‘Self-serving declarations are excluded, not because they might never contribute to the ascertainment of the truth, but because, if received, they would most commonly consist of falsehoods fabricated for the occasion.’ 12 Cyc. 427.”
This brings us to the consideration of the grounds of the motion for a new trial.
First. “That the verdict is contrary to the law and the evidence.” We have no jurisdiction over the facts in criminal cases affecting the guilt or innocence of the accused.
Second. “The court erred in its rulings as shown by bills of exceptions Nos. 1 to 6. inclusive.” These bills have already been disposed of in this opinion.
Third. “That the state offered as an eyewitness Sam Cardinella as to what was said and done while the deceased was on the pavement the instant the shooting was over, showed the deceased a butcher knife, and said, ‘Here is the knife that you forced my wife with.’ The defendant’s counsel asked the witness no questions on cross-examination. The state thereupon proved the motive,' *581 and the prosecution had no right to dispute it."
The reasons given by the trial judge and •the statement of facts made by him in overruling,the motion for a new trial show that he and the jury considered this alleged rape by Amato of defendant’s prospective wife as a pure fabrication. The trial judge declares that no motive was shown for the commission of the homicide, but refers .to certain facts in the conclusion of his statement of the reasons for refusing a new trial, as indicating a possible motive. The state, therefore, was not bound as to proof of motive.
Fourth. “The' state placed on the witness stand Sheriff L. H. Bouden, and, after laying .the proper foundation, swore to a confession of the defendant, but forgot to tell that the defendant did state to him that, just before the shooting, the deceased asked the defendant, ‘Do you think it is mine?’ That this was newly discovered evidence, because it was not known to defendant’s attorneys that when the defendant made the statement to Mr. Bouden, it was made on the day of .the killing, and your mover was in such an excited condition he forgot having made the statement to Mr. Bouden.”
As defendant testified before the jury in this ease, it is to be presumed that he told the jury that deceased asked him, just before the shooting, “Do you think it is mine?” If Sheriff Bouden unintentionally omitted to includé the statement when detailing the confession made to him by defendant, who was sitting by his attorney during the trial, defendant had the opportunity, then and there, to have called his attorney’s attention to this omission, and to have brought out this statement on cross-examination. Counsel for defendant did not cross-examine the witness. Defendant had a second opportunity to take the witness stand, in his own behalf and to include this statement in his own testimony before the jury, and it is not denied that he did so. For this court to hold that, after a defendant has testified to a fact before a jury, such fact is newly discovered evidence,' because counsel for defendant was not. aware of such fact, when the same was omitted by a witness for the state in detailing a confession, would be virtually to say that in every case facts known to a defendant and sworn to by him before a jury, but unknown to his attorney during the trial, can be made the basis for a motion for a new trial as newly discovered evidence. It is a significant fact that the attorneys in this case have not annexed to the motion for a new trial their affidavit stating that it was not known to them that defendant had included this statement in the confession made by him to the sheriff, and for this reason there was no cross-examination of this witness.
While the sheriff has made an affidavit in this case stating that he omitted to include this statement in the confession sworn to by him,' yet, on the trial of the motion for a new trial he states that he .thinks that he did include it, but is not positive about it.
As the evidence was not newly discovered, it could not b.e made a legal basis for a new trial.
Fifth. “That the defendant did not get that fair trial guaranteed by the Constitution because of the inflamed condition of the public mind on account of the so-called crime wave in the parish, so extensively advertised in the great daily papers of New Orleans and the local papers throughout Tangipahoa parish and that general sentiment that it must stop. This sentiment is so strong that two of the panel on their examination let it be unmistakably known, notably Mr. Ben Bennett.”
The minutes disclose the fact that Mr. Bennett did not sit on the jury which tried this case, and we are satisfied that the other juror on the panel, who is unnamed, did not *583 do so. We find no bills of exception reserved to the competency of any juror in the record. The record is also barren of any testimony to show that defendant could not obtain an impartial trial in the parish of Tangipahoa.
We will consider the sixth and seventh grounds of the motion for a new trial together.
Sixth. “That the jury commission of this parish, being of Anglo-Saxon origin themselves, placed in the jury box the name of no native-born or naturalized Italian race or nationality, notwithstanding they constitute 20 per cent, of the total population of the parish, all of which your mover offers to, prove. That no native-born or naturalized Italian was drawn on the three panels of, jurors drawn for this term of court, nor have any been drawn for the past two years, as shown by copies of lists. That this discrimination was all on account of racial or national conditions, and in actual practice placed them on an equality with negroes, who have never been drawn. Therefore this discrimination has denied your mover the right to be tried by a jury of his peers, and has denied him the equal protection of the Constitution and laws of the United States.”
Seventh. “That the jury commissioners aforesaid without exception have discriminated against native-born and naturalized Italian citizens in the selection of the grand jurors for the last four years, notwithstanding they constitute 20 per cent, of the total population of the parish, all on account of racial or national conditions, and in actual practice has placed them on the same footing as negroes who have never been 'drawn. That the grand jury which indicted Mm was composed exclusively of Anglo-Saxon origin and was drawn before the alleged crime was committed. That this flagrant and uncalled for discrimination has denied him the equal protection of the Constitution and laws of the United States, and that he is a resident of Rockford, Ill.”
Defendant alleges that this discrimination was not known to' him until after his conviction, and then on investigation, and said discrimination has worked an irreparable injury to him, unless granted relief.
We find no testimony in the record to show what percentage of the population of Tangipahoa parish is Italian, outside of the uncorroborated affidavit of mover. It is not alleged that the Italians of said parish are competent to serve as grand or petit jurors in criminal cases under the laws of this state, nor does mover pretend to say that the jury commissioners of the said parish have practiced any fraud in this .particular case in selecting grand and petit jurors. Nor has mover introduced'one scintilla of evidence to prove that the Italians in Tangipahoa parish have been discriminated against on account of racial or national conditions in this particular prosecution. The mere production of the jury lists, annexed to the motion, does not establish such charges per se.
In the case of the State v. Laborde, 120 La. 143, 45 South. 40, a motion for a new trial was filed in which the defendant charged that the motive of the sheriff in summoning tales jurors from a particular ward of the parish was to secure Americans as jurors as contradistinguished from Oreóles, as shown by the fact that out of 42 tales jurors only two were Oreóles, while the population of the balance of the parish was y5 per cent. Oreóle. The trial judge overruled the motion for a new trial, assigning as a reason therefor that—
“The court knows of no law excluding American jurors in criminal cases where a Creole is on trial. The jurors summoned were all competent tales jurors, who knew nothing of the case, and were- strangers to the accused, were fair-minded, and rendered a verdict according to the law and the evidence.”
TMs ruling was approved by this court on appeal. An accused has no constitutional right to require a trial by jurors who are ac *585 quainted with him, or from any particular portion of a parish, or of the same race.
The record in this case fails to disclose that the defendant was compelled to accept any but fair and impartial jurors on the panel which tried this case.
The constitutional guaranty to every citizen in this state is that in all criminal trials the accused shall have the right to a speedy public trial by an impartial jury. Constitution 1921, art. 1, § 9.
Section 1 of Act 135 of 1898, the jury law of this state, provides:
“That the qualifications of a juror to serve in any of the courts of this state shall be as follows: To be a citizen of the United States and of this state, * * * and to be a competent and intelligent person of full age having capacity to serve as a juror, to try and determine both civil and criminal cases, provided that there shall be no distinction made on account of race, color or previous condition. * * * In addition to the foregoing qualifications, a grand juror shall be able to read and write the English language and be a person of well-known good character and standing in the community.”
Section 4 of said act provides that the jury commission shall “select from the persons qualified under this act to serve as jurors for their respective parishes, the names of three hundred (300) competent, good and true men, * * * ” etc.
It is also provided in section 1 of said act:
“That the judges of the district courts shall have discretion to decide upon the competency of jurors in particular cases where from physical infirmity, or from relationship or from ignorance of the English language and inability to understand the same when read or spoken, or other causes, the person may be, in the opinion of the judge, incompetent to sit upon the trial of any particular case.”
The law of this state, therefore, clearly makes it the duty of the jury commissioners to select competent persons for jury service; and each commissioner is to' determine a's to the qualifications of the juror, whom he concurs with the other commissioners in selecting, upon his individual responsibility and according to his conscience and best judgment. The performance of this duty by the jury commissioner necessarily results in the selection of some persons for jury service and the exclusion of others, solely because of the competency or incompetency of the person selected or excluded. This is not a distinction or discrimination on account of race, color, previous condition, or national conditions, but is the salutary exercise of a wise discretion vested by law in the jury commissioners, in order that good and true men may be obtained for jury service, so as to secure to society an intelligent, impartial, and efficient administration of public justice. State v. Turner, 133 La. 555, 63 South. 169; State v. Ailes, 133 La. 563, 63 South. 172.
In the absence of any proof of fraud or designed discrimination in this particular case, it is to be presumed that the jury commissioners of Tangipahoa parish have performed their duties within the spirit of the law, and wisely and well.
The constitutional right of equal protection of the laws means that every one is entitled to stand before, the law on equal terms with, to enjoy the same rights as belong to, and to bear the same burdens as are imposed upon, others in a like situation. Railway v. Greene, 216 U. S. 400, 30 Sup. Ct. 287, 54 L. Ed. 536, 17 Ann. Cas. 1247; Standard Oil Co. of La. v. Police Jury, 140 La. 48, 72 South. 802.
Neither the provision in the state Constitution relative to trial by jury, nor the jury law of this state, Act 135 of 1898, deprives defendant of his right to the equal protection of the laws. Nor does the proof adduced by defendant on the trial of the motion for a new trial show that the jury commissioners of Tangipahoa parish have endeavored by fraud or by designed racial discrimination to deprive defendant of his constitutional *587 right of trial by an impartial jury. The grand jury that presented the indictment against defendant in this case was impaneled prior to the commission of the crime by defendant.
Finding no reversible error in the record, it becomes our solemn duty, after a careful investigation of the issues presented in this case, to let the law take its course.
For the reasons assigned, the judgment appealed from is affirmed.
Rehearing refused by the WHOLE COURT.