172 So.2d 657

**STATE of Louisiana**

v.

**Francis Aubrey CLIFTON.**

No. 47352.

Feb. 23, 1965.

Rehearing Denied March 29, 1965.

Edwin O. Ware, Kelly Hamm, Alexandria, for defendant-appellant.

Jack P. F. Gremillion, Atty. Gen., M. E. Culligan, Asst. Atty. Gen., F. Jean Pharis, Dist. Atty., for plaintiff and appellee.

SUMMERS, Justice.

Francis Aubrey Clifton was indicted by the grand jury of Rapides Parish for the September 15, 1962, murder of Clifton Carl Wilson. He was tried, convicted and sentenced to death. This appeal followed.

By motion to quash, appellant attacks the indictment returned against him and the composition of the petit jury which tried him. He relies upon alleged errors in the method employed by the jury commission in the selection of the general venire from which the grand jury and petit jury were drawn.

The objection is grounded upon the provisions of LSA–R.S. 15:179 and LSA–R.S. 15:180 [1] requiring that at the time of the meeting of the jury commission in composing the general venire they "shall select from the persons qualified to serve as jurors * * * three hundred persons, a list of whom shall be made under the supervision of the commission."

Appellant contends that this language is mandatory and a strict compliance with its provisions is required by law. There is a lack of strict compliance, he pleads, because each jury commissioner, when notified of the forthcoming meeting, prepared a list in advance of the meeting of those they would suggest for inclusion on the general venire. On each of these lists the commissioners also designated the persons recommended by them for inclusion on the grand jury panel.

The lists were submitted in advance to the clerk of court who cross-checked the names thereon with a card index file maintained in his office to ascertain if these persons were unable to read and write, had any physical infirmity or were otherwise disqualified to serve as jurors. The lists were then typed in advance of the meeting into one comprehensive master list. When the official meeting was held the commis-

---

[1] "§ 179. General venire; drawing of jurors

"At the time ordered by the district judge, the jury commission shall meet at the office of the clerk of the district court, and in the presence of two or more witnesses, shall select from the persons qualified to serve as jurors for their respective parishes three hundred persons, a list of whom shall be made out by the clerk under the supervision of the commission, and said witnesses. This list shall be the general venire list and shall be kept complete and supplemented from time to time as hereinafter enacted. Each of the names on said list shall be written by the clerk on a separate slip of paper, together with the number of the ward or place of residence of such person, and the slips of paper containing the names selected, except those containing the names of the persons chosen to serve as grand jurors as hereinafter provided, shall be placed in a box which shall be labeled: 'General Venire Box.' "

"§ 180. Selection of grand jury

"Immediately after completing the general venire list, the commission shall select therefrom the names of twenty citizens, possessing the qualifications of grand jurors, to be taken from different portions of the parish, as far as practicable, who shall be subject to duty as grand jurors during the term of six months after the grand jury is impaneled and until a succeeding grand jury shall have been impaneled.

"The names of the persons so selected shall be written on slips of paper, by the clerk, in the presence of the commissioners and they shall place the slips in an envelope, seal the same and indorse thereon the words: 'List of Grand Jurors.' "

sioners and the clerk of court, as a body, in the presence of witnesses, went over the master list to determine whether the persons thereon were qualified and to make other changes they considered necessary.

After eliminating persons not qualified and after making the necessary supplements to the master list, the commission approved the selection and finalized the list. The paper on which the list had been prepared was then cut so that each name was on a separate slip as the law requires, and, except for the names of persons chosen to compose the grand jury, the slips were then placed in the general venire box.

The method employed by the individual jury commissioners in preparing their lists in advance may, upon first impression, appear to be a departure from the obvious intendment of LSA–R.S. 15:179, requiring that there be supervision and common deliberation by the jury commissioners as a body over the names composing the general venire list.

■ On the other hand, the fact that advanced preparation is made by the jury commissioners in the compilation of names to be suggested for inclusion on the general venire does not require the conclusion that the venire was made without the benefit of common deliberation. Rather, a conscientious jury commissioner would not in every instance leave the important task of selecting none but good and competent jurors to be performed entirely at the time of the meeting. It would seem otherwise. He would, as some testified they did in this case, compile a list of persons from time to time in anticipation of the meeting and submit his suggestions to the assembled body for final selection and approval, much as was done in this case.

It could hardly be considered objectionable, and the case would be little different, if the commissioner, instead of writing his list in advance, came to the meeting with a list of names committed to memory which he would then submit to the jury commissioners as a body for approval and inclusion on the general venire

■ In any event the final selection in this case was actually made by the body as a whole with the benefit of the experience of the individual commissioners and the information they had previously compiled concerning persons they considered qualified as jurors. The final list, then, was made under their supervision after common deliberation regardless of the plans and preparations which preceded the meeting. There was, therefore, a substantial compliance with the requirement of LSA–R.S. 15:179 that *at the time of the meeting* the jury commission *shall select* from the persons qualified to serve as jurors three hundred persons, *a list of whom shall be made under the supervision of the commission.*

 Even if the practice outlined is considered technically irregular, it is not such an irregularity that the proceedings of the jury commission must be invalidated. For appellant's contention that the quoted portion of LSA–R.S. 15:179 is mandatory in all its details is not supported by the law of this State.[2] To the contrary, a variation from the strict letter of this law does not permit the composition of a grand or petit jury to be set aside because of insignificant technicalities or irregularities, unless there is a showing that some fraud has been practiced or great wrong committed which would work irreparable injury to the accused. LSA–R.S. 15:203; State v. Murphy, 234 La. 909, 102 So.2d 61 (1958), cert. denied, 357 U.S. 930, 78 S.Ct. 1376, 2 L.Ed.2d 1373

(1958); State v. Pierre, 198 La. 619, 3 So. 2d 895 (1941), cert. denied, 314 U.S. 676, 62 S.Ct. 186, 86 L.Ed. 541 (1941); State v. Dunn, 161 La. 532, 109 So. 56 (1926); State v. Davis, 154 La. 295, 97 So. 449 (1923); State v. Evans, 137 La. 379, 68 So. 732 (1915); State v. Sheppard, 115 La. 942, 40 So. 363 (1906), 1 Marr. Criminal Jurisprudence of Louisiana, §§ 424–426 (2d ed. 1923).

In the instant case there is not one scintilla of evidence nor the slightest intimation that the jury commissioners and the clerk of court were guilty of fraud in any respect. Indeed no contention is made to this effect by appellant. Moreover, we do not find, and appellant has not shown, how this particular method of selection, as

2. Appellant relies upon State v. Lively, 119 La. 363, 370, 44 So. 128, 130 (1907) and quotes extensively therefrom as follows: " * * * And so with regard to the drawing of the names. If it had been intended that the names should be drawn from an open box, why require that they should be placed in a sealed envelope and drawn from the envelope? And, if the law is to be regarded as merely directory, in that respect, at what point, if at all, shall we cease so to regard it? Would it be competent for the judge and the sheriff and the jury commission to adopt a simpler method of their own, and would it be legal to try, convict, and execute a man according to such method? We think not. The selection of a grand jury is a very serious matter, and the obvious purpose of the General Assembly was to place it, as far as possible, beyond interested control. It was not the purpose that the sheriff should have it in his power to read the names on the slips to be drawn by him. And, whether the plan adopted to defeat that result is good or bad, it is the plan prescribed by law, and the courts have no authority to countenance the substitution even of a better one. * * * "

There were three points involved in this case; the third point, from which the above quotation is taken, involved a complaint against the irregular drawing of the jury by the sheriff from a box instead of an envelope.

All of the members of the court concurred on the first two points in the decision, but, as to the last or third point upon which appellant relies, and from which the above quotation is taken, three members of the five-member court did not concur. The proposition relied upon, therefore, is nothing more than the expression of a minority view. It is not authoritative. Cf. State v. Mitchell, 119 La. 374, 44 So. 132 (1907).

such, brought about any great wrong which in any way prejudiced his cause. To substantiate this conclusion, among other things, the brief informs us that the accused was not compelled to accept any obnoxious juror and no complaint by way of a bill of exceptions is made to that effect.

By his motion to quash appellant also attacks the actions of the jury commission in not including on the general venire the names of persons entitled by law to claim exemption from jury service.

In support of this contention it is urged that by excluding persons entitled to exemptions from jury service from the general venire the due process and equal protection clauses of the state and federal constitutions are violated in that the grand and petit juries were not drawn from a cross section of the community.

The statute creating exemptions from jury service, as it existed in November 1962 when the general venire in question was formed, permits exemption to be claimed by officers and clerks of the legislature, the governor and other officials of the State, their clerks and employees, judges, officers of the courts, attorneys-at-law, physicians, surgeons, dentists, school teachers, school bus drivers, apothecaries, fire

department employees, commercial travelers, employees of common carriers, persons over sixty-five years of age, persons who had served as grand and petit jurors, telephone and telegraph operators, etc.[3]

The jury commissioners testified that these persons were not placed upon the list of persons comprising the general venire for, by their experience, it was shown that these exemptions were invariably claimed by the persons entitled to them and because of this the process of jury selection in court was delayed by their inclusion.[4] But appellant points out that the exemptions created by this statute are not in the nature of disqualifications of the categories therein enumerated, but, the exemptions are " * * * personal to those entitled thereto to be claimed by them alone, and the Jury Commission is not authorized by that law to bar those individuals from the jury lists." as we declared in State v. Goree, 242 La. 886, 139 So.2d 531 (1962).

■ A review of the language of LSA–R.S. 15:174 makes it quite clear that it was irregular for the jury commission to refuse to place the persons belonging to the exempted categories upon the general venire solely because they were entitled to claim exemption from jury service by that act.

---

3. LSA–R.S. 15:174 as amended by Act 215 of 1962.

4. Although the jury commissioners testified to this effect, they also testified that it was possible that some persons entitled to exemptions may have been in-

cluded if they were unaware of their occupations. Our review of the evidence establishes that some of the persons entitled to exemptions were included on the general venire.

However, it has often been held that persons in this category may properly be excluded from jury service by state law without impairing the right of the accused to a jury selected from a cross section of the community when the excluded categories are such as those concerned with official public duties, health, spiritual affairs, education, legal counsel, etc., as is true of those entitled to exemptions under our law. In such cases it is said that the best needs and interests of the community are served by permitting these categories to continue their services without the interruptions incident to jury service. Rawlins v. Georgia, 201 U.S. 638, 26 S.Ct. 560, 50 L.Ed. 899 (1906); 21 Tul.L.Rev. 116 (1946).

What we found in the Goree case was that there were many Negroes in that parish but not many were qualified, and among those who were qualified many were Negro professors, school bus drivers and others who were entitled to claim exemptions from jury service. By excluding these exempted categories from the general venire, we found, the jury commission thereby reduced substantially the number of qualified Negroes who might be included on the jury lists. The accused in the Goree case were Negroes and, because of the limited number of qualified Negroes in that parish, and because no Negroes had been included on the juries for many years, we noted that the exclusion of Negroes in the exempted categories contributed substantially to the total exclusion of Negroes. This combination of circumstances, we held, established a prima facie case of systematic and intentional exclusion on the basis of race and color in direct conflict with the Constitution. The exclusion of Negroes entitled to claim exemptions only contributed to the system; it was not, in itself, the sole basis for the decision in the Goree case.

■ In the case at bar it does not appear that defendant belonged to an excluded class such as was true of the Negroes in the Goree case, and, even with the exclusion of persons entitled to exemptions in the case at bar, there remained a sufficient number of qualified jurors from an adequate cross section of the parish to assure a fair and impartial trial to the accused without any evidence of discrimination against the class to which he belonged. There is nothing to indicate that inclusion of any of the exempted categories might have altered the jury verdict. Here, as our Federal Supreme Court has observed (Fay v. New York, 332 U.S. 261, 67 S.Ct. 1613, 91 L.Ed. 2043 (1946)), we may reiterate that,

"This Court * * * has never entertained a defendant's objection to exclusion from the jury except when he was a member of the excluded class. * * * Even in the Negro cases this Court has never undertaken

to say that a want of proportionate representation of groups, which is not proved to be deliberate and intentional, is sufficient to violate the Constitution."

■ The nature of the exemptions afforded by LSA–R.S. 15:174 entitled the State legislature to exclude those categories from jury service without violating any constitutional right of the accused. The fact that the exclusion took place as a result of the jury commission's action on an administrative level and constitutes an administrative irregularity does not make a significant difference. The action is not unconstitutional when the same action by the legislature would have been permissible. It is the nature of the action which is important and not how it is carried out. Nor is this irregularity meaningful if a fair and impartial jury could otherwise be obtained.

■ There is no showing here that the juries which did serve were not drawn from a fair cross section of the parish; and, furthermore, appellant has not shown, as he must, that fraud has been committed or a great wrong resulting in irreparable injury has occurred by reason of the irregularity complained of. LSA–R.S. 15:203. This is particularly true, as we have already shown, when the party on trial has not exhausted his peremptory challenges and shown by a bill of exceptions that he has

been compelled to accept an obnoxious juror. We therefore dismiss this contention as unfounded.

In October of 1962 other criminal trials were pending before the trial court in Rapides Parish. A motion to quash the indictment was filed in one of those cases involving an accused Negro named Baggett. The motion was based upon the proposition that members of the Negro race were systematically excluded from the grand jury which indicted Baggett. The trial judge found the contention to be well-founded. He accordingly sustained the motion and quashed the indictment against Baggett. Shortly thereafter on November 16, 1962, the jury commission met to compose another general venire. A grand jury venire was selected from this general venire and in due time a grand jury was empanelled which indicted the appellant Clifton. The grand jury in question was composed of nine whites and three Negroes.

By allegations in a motion to quash that indictment Clifton contends that in this meeting on November 16, 1962, the jury commission intentionally and systematically included Negroes on the venire from which the grand jury was drawn which indicted him. In so doing, it is asserted, a violation of his constitutional and statutory rights of due process of law occurred because the jury was not indiscriminately selected from a cross section of the parish.

As we understand appellant's contention, because the trial court found that there existed a system of exclusion of Negroes in Rapides Parish prior to November 16, 1962, the subsequent inclusion of Negroes on the juries evidenced a planned effort to include Negroes where none were included before. For this reason, the argument proceeds, the juries which indicted and tried the accused were constituted contrary to the announcements contained in Collins v. Walker, 329 F.2d 100 (1964), where the court observed, "That systematic inclusion of any limited number of Negroes because of race, means, however, a corresponding systematic exclusion of Negroes from the remaining number of the venire."

■ At the outset, it should be observed that the existence of a plan or system to intentionally include or exclude Negroes on juries is a question of fact, and no such system or plan has been shown by the facts of this case, unless it can be inferred from appellant's theory. Hernandez v. Texas, 347 U.S. 475, 74 S.Ct. 667, 98 L.Ed. 866 (1954).

What we observe has occurred in this case is not that Negroes have been intentionally and systematically included, but that the jury commission's present practice is not to intentionally and systematically exclude them. The result of discarding the reprobated system is to bring about the inclusion of Negroes. Appellant has seized upon the contrast in the two practices in an effort to impute a system of inclusion of Negroes to the jury commission simply because Negroes are now on juries where there were none before. Under this theory this jury commission could never form a jury containing Negroes without the inference being drawn that it was done intentionally and systematically.

Acceptance of appellant's theory would place the jury commission in an irreconcilable predicament and frustrate the prosecutor in his effort to discharge his duty and society's right to vindicate this atrocious wrong committed against it.[5]

5. Clifton Carl Wilson, the victim of this crime, was employed by the U.S. Department of Agriculture on assignment in Gonzales, Texas, when last heard from by his relatives or employer.

At the time he was last seen Wilson was driving his 1962 blue Oldsmobile Starfire Coupe. On the evening of September 14, 1962, he picked up the accused, a hitchhiker, near Beaumont, Texas; Wilson being on his way to his home in Jonesville, Louisiana.

From Beaumont, Texas, he drove through Alexandria, Louisiana, enroute to Jonesville. As they were passing through the small town of Jena, Louisiana, which lies approximately thirty miles southeast of Jonesville the accused drew his .25 calibre pistol and ordered Wilson to pull over to the side of the road and stop.

Brandishing the pistol, he ordered Wilson out of the car and asked him how much money he had. Wilson had a one dollar bill and a check for $143.00. The accused took Wilson's billfold and the check and they then got back into the car. After driving a short distance, the

The party attacking the composition of the jury bears the burden of establishing the system of inclusion as a matter of fact. It is not to be inferred from unsupported theories and probabilities. This burden imposed by law upon the appellant has not been discharged. To the contrary, the jury commissioners testified that Negroes were included on the lists, not because they were Negroes, but because they were Americans. They testified also that changes were made in the names of persons submitted for the grand jury not because they were Negroes but because the persons finally submitted for inclusion were better qualified. There is no showing of a system of intentional inclusion of Negroes and the inclusion which did occur did not deprive the appellant of a jury selected from a cross section of the community, but, to the contrary, it assured that result.

Furthermore, appellant is not a Negro and he cannot complain of the inclusion of Negroes on the juries unless he is a member of that class and deprived thereby of a jury selected from a cross section of the community. Fay v. New York, 332 U.S. 261, 67 S.Ct. 1613, 91 L.Ed. 2043 (1946); State v. Lea, 228 La. 724, 84 So.2d 169 (1955), cert. denied, 350 U.S. 1007, 76 S.Ct. 655, 100 L.Ed. 869 (1956); State v. Dierlamm, 189 La. 544, 180 So. 135 (1938); State v. West, 116 La. 626, 40 So. 920 (1906).

The foregoing contention is without merit.

On June 10, 1963, the day fixed for the final trial, appellant filed a supplemental demurrer and motion to quash the indictment and a supplemental motion to quash, vacate and dissolve the general venire list, the grand jury panel, the petit jury panel called for service on that day and the then current tales jury list. The motion attacked the composition of the general venire list from which the grand jury, petit jury and

accused again ordered the car stopped and ordered Wilson to get out of the car. They then walked a short distance in the woods and the accused ordered Wilson back into the automobile and demanded that he return on the route which they had just traveled through Alexandria, Louisiana, and toward Glenmora, Louisiana.

About four miles south of Glenmora, Louisiana, the accused ordered Wilson to turn off the Alexandria-Lake Charles Highway and proceed down a gravel road about four miles to an intersecting road, which he did. Whereupon the accused ordered Wilson to turn right. They drove about a mile up the intersecting

gravel road when the accused again ordered Wilson to stop the car and get out on a lonely country road.

The accused then compelled Wilson to precede him into the woods and, after walking some distance, the accused shot him in the back of the head.

While Wilson lay writhing in pain, the accused placed the pistol close to his head and delivered the fatal shot about two inches above the left ear, the bullet passing through Wilson's head and coming out in front of the right ear, causing his death.

The victim's remains, desecrated by wild animals, were later found at the scene of the crime.

tales jury lists were formed, because members of certain alleged legally cognizable groups had no representation, or only token representation, or grossly disproportionate representation on the jury lists.

The groups alleged to be improperly represented on the jury lists were persons of the female sex; residents of Ward 6 in Rapides Parish; persons over 21 years of age, but less than thirty years of age; members of the Catholic faith; Negroes; persons of Italian or Syrian national origin; persons entitled to exemption from jury service by law referred to in Article 174 of the Code of Criminal Procedure; persons over 65 years of age; segments of the experienced labor force such as craftsmen, foremen, operatives, service workers, household workers, farm laborers and foremen, other laborers and members of organized labor.

At the same time appellant also filed a motion to subpoena three hundred persons as witnesses on the trial of the motion to quash. These witnesses constituted the general venire from which the jury was to be selected for the trial scheduled for that day.

Of the three hundred witnesses subpoenaed, one hundred were in court, having been ordered to attend as members of the petit jury venire. They, therefore, were available to testify. But counsel for appellant nevertheless insisted that subpoenas be issued for the remaining two hundred.

The court denied the motion for the subpoenas. This ruling was objected to and forms the basis of the bill of exceptions under consideration.

The ruling of the trial judge was correct. It is true, as appellant's counsel contends, that the right to compulsory process is guaranteed by the constitution of this State (La. Const. of 1921, art. 1, § 9, LSA) and by our statutory law implementing that constitutional guarantee (LSA–R.S. 15:144 et seq.).

The right of the accused to compulsory process, however, is predicated on the exercise of due diligence by him to secure the attendance of his witnesses. LSA–R.S. 15:148; State v. Rather, 138 La. 198, 70 So. 96 (1915); State v. Allen, 129 La. 733, 56 So. 655 (1911); State v. Turner, 129 La. 702, 56 So. 644 (1911); State v. Stewart, 117 La. 476, 41 So. 798 (1906).

These facts present the question of whether the accused has exercised due diligence to obtain attendance of the 200 witnesses for which subpoenas were sought.

As we have recited, the supplemental motions to quash and the motion to subpoena the three hundred witnesses were filed on the day the case was fixed for trial. On this showing alone we feel there was a failure on the part of appellant to exercise "all reasonable diligence" to procure his witnesses. LSA–R.S. 15:148. As the district attorney points out in his brief, and as

appellant's counsel undoubtedly knew, witnesses had been summoned by the State from Detroit, Michigan, Washington, D. C., and from different parts of Louisiana. These witnesses were present in court on the date assigned for the trial. Allowing the motion for the subpoena of two hundred witnesses on that day would have required at least a week for service. This, together with an additional week required for the trial of the case, would have necessitated holding the case over for the fall term of court. Under these circumstances it was entirely unreasonable for appellant to wait until the day of trial to subpoena such a large number of witnesses.

 If we were to concede for the sake of argument that error was committed by the court in its ruling on this question, it is not made to appear, nor can we discern, that any prejudice has occurred to appellant as a result of this ruling. LSA–R.S. 15:509 (2), 557; 6 La.L.Rev. 453 (1945).

We are convinced of this, for the record reveals that questionnaires were submitted to members of the general venire and were designed to supply the information required to support appellant's motion to quash. From the information contained on these questionnaires it is shown that the groups allegedly without representation on the general venire were not entirely excluded therefrom (except for many of those entitled to exemptions from jury service under Article 174 of the Code of Criminal Procedure, which we have already discussed in connection with another bill).

 It is obviously impossible for all of the so-called categories appellant lists to be represented on every jury. Therefore, in instances where certain groups are not represented, it does not follow that a system of discrimination exists. Nor would it necessarily mean that an adequate cross section of the community was not contained on the venire. Actually it appears to us from the information contained on the questionnaires that a satisfactory cross section of the community's occupations, religions and ethnic groups were represented and the law requires no more.

 By way of illustration, the complaint that no persons of the female sex were included on the jury (though not entirely correct) is without substance for the law of this State does not permit women to be drawn for jury service unless they file a written declaration of desire for such service. La. Const. of 1921, art. 7, § 41; LSA–R.S. 15:172.1.

 The complaint that there were no persons from Ward 6 of the parish is not meritorious even if assumed to be correct. For the accused is not entitled to a jury selected from any particular geographical area of the parish. State v. Goree, 245 La. 389, 158 So.2d 203 (1963); State v. Guirlando, 152 La. 570, 93 So. 796 (1922); State v. Manuel, 133 La. 571, 63 So. 174 (1913);

State v. LaBorde, 120 La. 136, 45 So. 38 (1907).

■ The contention that the 14th amendment requires proportional representation of all the component ethnic groups of the community on every jury has been rejected. State v. Barksdale, 247 La. 198, 170 So.2d 374 (1965).

The foregoing bill of exceptions is therefore without merit.

■ In Bill of Exceptions No. 4 appellant sets forth that a hearing in his case was held in open court on April 30, 1963, at which he was required to appear without counsel. The trial judge's per curiam satisfactorily explains this matter in these words:

"No hearing, as such, was held on April 30, 1963 as stated in the Bill of Exception. The only thing that was done in open Court on April 30, 1963 was inquiry by the Court to determine whether or not counsel should be appointed to represent the accused.

"When this accused was first brought to Court, the Court appointed Mr. Edwin O. Ware and Mr. Kelly Hamm to represent him. Subsequent to this, Mr. N. Cleburn Dalton, an attorney, was being held in our Parish Jail on warrant of the Coroner of East Baton Rouge Parish. At this time Mr. Dalton became acquainted with Mr. Clifton and Mr. Dalton agreed to represent Mr.

Clifton on this charge. A hearing was held in open Court on the motion of the two appointed attorneys to be relieved because the accused had employed his own attorney. The Court granted the motion and relieved Mr. Ware and Mr. Hamm of the appointment.

"On several occasions subsequent to Mr. Dalton's being enrolled as attorney of record for the accused, Mr. Dalton did not appear in Court for scheduled matters of this case, including a scheduled trial. It was necessary to discharge the jury panel that had been summoned. A sanity hearing was scheduled for April 30, 1963 and again Mr. Dalton did not appear. It became apparent to the Court that something was going to have to be done, otherwise no action could ever be taken in this case because the accused's counsel just did not appear for the hearings and trial. The Court had learned that Mr. Dalton had been committed to Central Louisiana State Hospital. One of the physicians who had appeared for the sanity hearing is the Superintendent of Central Hospital. In order to determine whether or not Mr. Dalton could competently represent the accused Dr. Arthur Seale was called to the witness stand. Dr. Seale stated that Mr. Dalton was an inmate of the institution. Dr. Seale advised the

Court that in his opinion Mr. Dalton was not then competent to act as counsel for an accused charged with murder, and he did not know when Mr. Dalton would be considered competent to undertake such a task. Upon receiving this information the Court reappointed Mr. Ware and Mr. Hamm to act as counsel for the accused. There was nothing done to the prejudice of the accused, it was only an inquiry by the Court to determine whether or not the accused was properly represented and if, in the opinion of the Court he was not, then to assign him additional counsel for his own protection.

"The sanity hearing that was set to be heard that day was not heard but was continued to a later date.

"The only thing that the Court did in this case on April 30, 1963 was to see that the accused was afforded his rights under the U. S. and Louisiana constitutions."

The final bills of exceptions urged on this appeal were reserved to the denial of motions filed by court-appointed counsel in this case to be relieved of their appointment or, alternatively, to have a fee fixed for their services and to be furnished stenographic and secretarial services needed in connection with their defense of the accused.

It is argued that appointment of counsel to serve without fee and to bear the stenographic, secretarial and out-of-pocket expense required is a taking of counsel's property without adequate compensation contrary to Article I, Section 2 of the Louisiana Constitution.

The argument is made that an attorney's time and advice are "property" within the meaning of the constitutional article; that an attorney's time, knowledge and skill are real assets and to compel him to give them without compensation violates the constitutional guarantee that there will be no taking of his property without due process of law and without the payment of adequate compensation.

We do not agree with counsel in this case. The professional obligations assumed by attorneys in this State require that a reasonable amount of time and effort be devoted to promoting the cause of justice, including the defense of indigent accused without compensation. The high purpose and traditions of the legal profession require that this burden be shouldered by its members. So long as the burden is not oppressive and is fairly shared among the members of the bar to which they belong there is no cause for complaint. Mr. Ware has only been called upon twice in his career to defend indigent accused in capital cases. This is Mr. Hamm's first capital case by appointment. Counsel have not shown that the task imposed upon them is so onerous that it constitutes an abusive extension of their professional obligations.

· [22] In matters of this nature a broad discretion is vested in the trial court judge, and appointments made by him will not be disturbed unless a clear abuse of that discretion is manifest.

In any event, the accused has been well represented at every stage of the proceedings and the trial court's disposition of this motion has not affected his right to a fair and impartial trial.

The conviction and sentence are affirmed.

172 So.2d 668