His Honor charged the jury "that they must be satisfied, beyond a reasonable doubt, that the prisoner killed the deceased; that he intended to kill her, and that he had no legal provocation at the time (502) of killing her, before they would be justified in finding him guilty of murder; that if they doubted on any of those points they ought not to find him guilty of murder." He charged the jury further, "that if the deceased attempted to burn the barn, still house, or kitchen of the defendant, or if she put poison in a pot to poison the family, or stole turnips, or disobeyed the orders of her master, these were all acts of legal provocation; and if the defendant killed the deceased, upon the discovery of any of the aforesaid offenses, or in so short a time thereafter that the passion of the defendant had not a reasonable time to subside, the slaying would be manslaughter, and not murder."
His Honor further charged the jury that "if they were satisfied beyond a rational doubt that the defendant was the slayer, and they were further satisfied that he had no legal provocation at the time of slaying, or so short a time before that his passion had not a reasonable time to cool and subside, they were at liberty to presume a deliberate intent to kill, and it would be murder.
The jury were further instructed "that the legal provocation which would extenuate the slaying from murder to manslaughter must be given at the time the fatal blow was inflicted, or so short a time before that there was not a reasonable time for the defendant's passion to subside and reason to assume her sway." And the jury were further instructed "that if they were satisfied beyond a reasonable doubt that the defendant was the slayer, it was incumbent on him to show that he was acting under the influence of a legal provocation at the time of the fatal deed, in order to extenuate the act from murder to manslaughter; but they *Page 395 
might and ought to look into all the circumstances disclosed by the testimony, and infer from the evidence, if they could do so, that the defenant [defendant] was acting under the influence of passion, excited by legal provocation, at the time the fatal blow was given."
The prisoner was convicted and moved for a new trial on the ground that the jury was misdirected by the court. The motion being overruled and sentence of death pronounced, the prisoner appealed.
With deep sorrow we perused the statement of the (503) case as it appeared upon the evidence, and we cannot surmise a ground on which the prisoner could expect a venire de novo. Indeed it seems to us that the case was left hypothetically to the jury, much more favorably for the prisoner than the circumstances authorized.
A master may lawfully punish his slave, and the degree must, in general, be left to his own judgment and humanity, and cannot be judicially questioned. State v. Mann, 2 Dev. Rep., 263. But the master's authority is not altogether unlimited. He must not kill. There is, at the least, this restriction upon his power: he must stop short of taking life. It has been repeatedly held that independent of the act of 1791 the killing of a slave may amount to murder, and this rule includes a killing by the master as well as that by a stranger. State v. Will, 1 Dev. and Bat., 121. It must indeed be true, in the nature of things, that a killing by the owner may be extenuated by many circumstances, from which no palliation could be derived in favor of a stranger. But it is almost self-evident that this prisoner can claim no extenuation of his guilt below the highest grade. It is, perhaps, sufficient merely to declare that to be the opinion of the Court, without undertaking the revolting task of collating and minutely commenting on the horrid enormities detailed by the witnesses. But some of the terms used in laying the case before the jury render it our duty, as we think, to notice the circumstances somewhat more particularly.
If death unhappily ensue from the master's chastisement of his slave, inflicted apparently with a good intent, for reformation or example, and with no purpose to take life, or to put it in jeopardy, the law would doubtless tenderly regard every circumstance which, judging from the conduct generally of masters towards slaves, might reasonably be supposed to have hurried the party into excess. But the acts imputed to this unhappy man do not belong to a state of civilization. They are barbarities which could only be prompted by a heart in which every *Page 396 
humane feeling had long been stifled; and indeed there can scarcely be a savage of the wilderness so ferocious as not to shudder at the recital of them. Such acts cannot be fairly attributed to an intention to (504) correct or to chastise. They cannot, therefore, have allowance, as being the exercise of an authority conferred by the law for the purposes of the correction of the slave, or of keeping the slave in due subjection. The Court is at a loss to comprehend how it could have been submitted to the jury that they might find an extenuation from provocation. There is no opening for such an hypothesis. There was no evidence of the supposed acts, which, it was thought, might be provocations. But if they had been proved this Court could not have concurred in the instructions — given, doubtless, from abundant caution and laudable tenderness of life. We could not have concurred, because however flagrant the provocation, the acts of the prisoner were not perpetrated in sudden heat of blood, but must have flowed from a settled and malignant pleasure in inflicting pain, or a settled and malignant insensibility to human suffering. There was none of that brief fury to which the law has regard as an infirmity of our nature. On the contrary, without any consideration for the sex, health, or strength of the deceased, through a period of four months, including the latter stages of pregnancy, delivery, and recent recovery therefrom, by a series of cruelties and privations in their nature unusual, and in degree excessive beyond the capacity of a stout frame to sustain, the prisoner employed himself from day to day in practicing grievous tortures upon an enfeebled female, which finally wore out the energies of nature and destroyed life. He beat her with clubs, iron chains, and other deadly weapons, time after time; burnt her, inflicted stripes over and often, with scourges, which literally excoriated her whole body; forced her out to work in inclement seasons, without being duly clad; provided for her insufficient food; exacted labor beyond her strength, and wantonly beat her because she could not comply with his requisitions. These enormities, besides others too disgusting to be particularly designated, the prisoner, without his heart once relenting or softening, practiced from the first of December until the latter end of the ensuing March; and he did not relax even up to the last hour of his victim's existence. In such a case, surely, we do not speak of provocation, for nothing could palliate such a course of conduct. (505) Punishment thus immoderate and unreasonable in the measure, the continuance, and the instruments, accompanied by other hard usage and painful privations of food, clothing, and rest, loses all character of correction in foro domestico, and denotes plainly that the prisoner must have contemplated the fatal termination, which was the natural consequence of such barbarous cruelties. *Page 397 
In such a case, too, we think it incorrect to say that the jury must be satisfied the prisoner intended to kill the deceased before he could be properly convicted. It is ordinarily true that an actual intent to kill is involved in the idea of murder. But it is not always so. If great bodily harm be intended, and that can be gathered from the nature of the means used or other circumstances, and death ensue, the party will be guilty of murder, although he may not have intended death. The intent, by severe and protracted cruelties and torments, to inflict grievous and dangerous suffering, or, in other words, to do great bodily harm, imports, from the means and manner thereof a disregard of consequences, and consequently the party is justly answerable for all the harm he did, although he did not specially design the whole. 1 Hale P. C., 440; Fost, 219; East P. C., 257.
In conclusion, the Court is obliged to say that whatever error crept into the trial was in favor of the prisoner and that nothing occurred of which he can complain. It is the opinion of this Court that the judgment ought not to be reversed, which will accordingly be certified to the Superior Court that further proceedings may be there had for the execution of the sentence of the law on the prisoner.
PER CURIAM. Judgment affirmed.
Cited: State v. Robbins, 48 N.C. 256; State v. Shirley, 64 N.C. 612.
(506)