FOURNET, Justice.
 

 Hugh Pierre was tried, convicted, and.. sentenced under an indictment for the murder of Ignace Roussell, and from his. conviction and sentence to hang he has. appealed.
 

 The record reveals that as the result of ‘ a controversy between the accused and..
 
 *622
 
 Leopold Ory over a plow during the afternoon of October 20, 1936, a warrant for his (Pierre’s) arrest on a charge of assault with a dangerous weapon with intent to kill was issued upon the affidavit of Ory filed before the Justice of the Peace for the First Ward of St. John the Baptist Parish. On the same evening, at about 7, the constable of the ward, Ignace Roussell, attempted to serve this warrant on Pierre at his mother’s home, where he resided, and was informed by her that he “wasn’t going to take Hugh to jail that night.” In the midst of this conversation, Pierre, standing inside the house, fired two loads of buckshot from a sawed-off shotgun into Roussell’s body, instantly killing him, and he fell at the foot of the porch steps where he had been standing. The accused immediately escaped through the rear of the house and fled into the adjoining parish of St. Charles, where he remained in hiding until the morning of October 22, when he was arrested at about 11:30 in the morning in the shed at the home of Varise Champagne. On the same day the accused was questioned by the District Attorney for the Twenty-fourth Judicial District in the presence of Police Captain Cook and T. J; Carbrey, the official court stenographer for the judicial district who took down his testimony, comprising some twelve typewritten pages. Pierre’s version of the shooting was fairly summarized in a question propounded by the District Attorney in the following words: “In other words, you want me to understand that when Roussell came there, you went back to get that gun while Roussell was outside, as you say, by the door with a pistol, you were back in there loading the gun and put one shell in it and shot him, and you took the shell out and put five more in it and went down to Champagne’s with it?” To this question Pierre answered “Yes.” Neither the statement of the accused that the deceased had drawn his pistol nor his statement inferring that the deceased had demonstrated hostility, is corroborated by any evidence whatsoever; in fact, the evidence is conclusively to the contrary.
 

 On January 18, 1937, following, Pierre was indicted by a grand jury for the Parish of St. John the Baptist for the murder of Roussell, and, on the trial of the case, was found guilty as charged. His conviction and sentence to hang were affirmed by this court on appeal (State v. Pierre, 189 La. 764, 180 So. 630) but the decision was reversed when reviewed on a writ of certiorari granted by the United States Supreme Court (Hugh Pierre, Petitioner v. State of Louisiana, 306 U.S. 354, 59 S.Ct. 536, 83 L.Ed. 757) for the reason that members of his race (negro) had been - systematically excluded from the general venire from which was drawn the grand jury that had returned the indictment against him for the murder of a white man, in contravention of the due process clause of the constitution of the United States (Amendment No. 14) and of the State of Louisiana (Section 2 of Article I).
 

 Following the decision of the Supreme Court of the United States the defendant was indicted on three different occasions. The trial judge quashed the first indictment for the reason that one of the grand
 
 *624
 
 jurors returning the same was disqualified to serve as such because of his inability to read and write the English language. The second indictment was quashed because the trial judge thought some of the testimony of two of the jury commissioners who had selected the grand jury indicting the defendant might be construed to mean that these two commissioners were prejudiced against negroes serving on either grand or petit juries, although, as a matter of fact, negroes had actually served on the grand jury that indicted the defendant the second time. Prior to the quashing of this second indictment, the trial judge, because of the testimony of the two commissioners just referred to, requested their resignation and, on June 15, 1940, appointed three new commissioners, two to replace the commissioners resigned and one to replace another commissioner whose business did not permit him to serve.
 

 ■ The new jury commission was then ordered by the trial judge to draw a new grand and petit jury from a list of 300 names to be submitted by them. Complying with this order the commission met, and, after having removed from the general venire box the names that remained there from the old commission, they proceeded to place in the box the 300 names submitted by them, after they had been written on slips of paper by the clerk of court, and, in compliance with the provisions of the Code of Criminal Procedure, to select the grand jury panel (Article 180) and to draw the petit jury panels for the weeks of July 22 and 29, 1940 (Article 181). Of the 300 names submitted by this new commission, 52 were negroes. There were five negroes on the grand jury panel of twenty and two on the grand jury of •twelve that returned the third indictment against the defendant (the indictment upon which he was tried and convicted). One negro actually sat on the jury that tried and convicted Pierre.
 

 The defendant, in a motion to quash the indictment, has challenged the general venire array, as well as the grand jury panel that indicted him the third time and the petit jury panel from which was selected the jury that convicted him. The defendant’s first bill of exception is reserved to the trial judge’s ruling refusing to quash the indictment.
 

 The motion to quash is lengthy, comprising some fourteen paragraphs. For the purposes of this opinion, however, the allegations of the motion may be said to be substantially as stated in defendant’s brief —“ * * * that the Jury Commissioners fraudulently conspired to discriminate against negroes, because of their race and color, from serving upon Juries, although a certain amount, 31 in all [the record shows that there were 52 negroes on the venire list], had been placed in the Venire of 300 names; that they additionally packed the Jury with Jurors hostile to Defendant, incompetent in many ways, and many who were relatives of officers of the Parish hostile to Defendant, and ~also some who had served on Grand and Petit Juries that had indicted and tried Defendant.” (Brackets ours.)
 

 It may be seen from the foregoing that counsel for the defendant has narrowed the basic allegations of the motion to quash.
 
 *626
 
 the indictment to an alleged fraudulent ■scheme of the jury commissioners to discriminate against the defendant (1) by excluding negroes from the general venire list, and (2) by packing the list with persons incompetent to serve because of their hostility to the defendant, relationship to parish officials hostile to the defendant, or former service on grand juries that had indicted him or petit juries that had previously tried and convicted him, rather than •on any defects in the indictment apparent on the face thereof or because of the incompetency of any particular member of the grand jury that had returned the indictment.
 

 The Code of Criminal Procedure expressly provides that the five jury commissioners selected by the district judges of the state to serve in each parish and who, with the clerk of court or his deputy, who is an ex-officio member, constitute the jury commission of the respective parish, need have no other qualifications than that they be “qualified electors, good men and true, able to read and write the English language * * and hold no other public office. Article 175. It also specifically provides that the general venire list of 300 names shan be composed of persons selected by the members of the jury commission “from the persons qualified to serve as jurors for their respective parishes * Article 179. Persons who are qualified to serve as jurors in this state are those who are: (1) Citizens of the state, over the age of twenty-one, with two years’ residence in the parish; (2) able to read and write the English language; (3) not charged with any offense or convicted of a felony; and (4) of well-known good character and standing in the community. Article 172. The article (172) further provides “that there shall be no distinction made [in their selection] on account of race, color or previous condition of servitude * * (Brackets ours.) But “The law does not direct from what source the commissioners shall obtain knowledge, of qualified jurors or seek for names * * *. The law seems to trust the matter to the discretion of the commissioners * * *. But the jury commission must make their own selection from those qualified for jury service * * Vol. 1, Marr’s Criminal Jurisprudence, 2d Ed., 624, Section 411.
 
 “In the absence of proof of fraud or designed, discrimination, it is to be presitined that the jury-commissioners in making up the jury lists performed their duties within the spirit of the lazv, and wisely and well.”
 
 Marr’s work, supra, Section 413. (Italics ours.) See, also, State v. Guirlando, 152 La. 570, 93 So. 796.
 

 In a motion to quash an indictment because of any defects or irregularities in the constitution of the grand jury returning the same, the allegations upon which the motion is based must be proved, the burden of proof being on the mover. Not only must the mover specify these grounds in the motion, but they must also be sustained by distinct and competent evidence. See Article 286 of the Code of Criminal Procedure; 31 Corpus Juris 813, Section 392; United States v. Lynch, D.C., 11 F.2d 298; State ex rel. Pettigrew v. Hall, 109 La. 290, 33 So. 318; State v. Horn, 167
 
 *628
 
 La. 190, 118 So. 884; Oliver v. State of Texas, 70 Tex.Cr.R. 140, 159 S.W. 235; Smith v. State of Mississippi, 162 U.S. 592, 16 S.Ct. 900, 40 L.Ed. 1082; Tarrance v. Florida, 188 U.S. 519, 23 S.Ct. 402, 47 L.Ed. 572; and Brownfield v. South Carolina, 189 U.S. 426, 23 S.Ct. 513, 47 L.Ed. 882.
 

 A careful examination of the record shows that the defendant has utterly-failed to prove the allegations upon which his motion to quash is based, although he was allowed the widest possible latitude by a most considerate judge in the summoning of witnesses and the introduction of evidence.
 

 In all the defendant summoned as witnesses the 300 persons whose names were on the general venire list, the five jury commissioners, the clerk of court, the chief deputy sheriff, the sheriff, and some 383 negroes from all over the parish. When the motion to quash was tried, however, he did not offer any evidence to sustain his allegation that persons on the general venire list were hostile, incompetent, or disqualified to serve. As a matter of fact he only placed on the witness stand one of the 300 persons on the general venire list (Edmond Trosclair) and even he was not questioned about his qualifications or beliefs but only as to whether or not he had been on other venire lists in the parish. (It was proved that this person had never before done jury service.) Defendant’s counsel did question approximately 260 of the 383 negroes summoned, but his examination of these witnesses on the stand was confined strictly to their ability to qualify for jury service. The fact that the chief deputy sheriff of the parish testified as to his relationship to some of the persons on the general venire list and the relationship of others on the list of some of the parish officials, has no bearing on this issue. Conceding for the sake of argument that some members of the general venire list may have been hostile toward the defendant or incompetent to serve as jurors for any cause whatsoever, that is, nevertheless, not ground for quashing the list without proof that “fraud has been practiced or some great wrong committed” (Article 203 of the Code of Criminal Procedure), although the fact that a prospective juror is hostile or otherwise incompetent may be availed of as grounds for challenging him for cause. Article 351 of the Code of Criminal ■Procedure.
 

 There is no question in our mind but that the record in this case reflects that the defendant received a fair and impartial trial before a most considerate judge. In fact, the rulings of the trial judge throughout the trial proper were such that the defendant did not reserve a single bill of exception to any of them. The only bills of exception reserved were to the ruling of the trial judge refusing to quash the indictment and his refusal to grant a new trial or arrest the judgment, the two latter motions being based on substantially the same grounds urged in the motion to quash.
 

 In disposing of the motion to quash.the trial judge gave a detailed review and an-’ alysis of the testimony taken on the trial of the motion, as well as the pertinent au
 
 *630
 
 thorities applicable thereto. In his opinion he answers every issue raised, and we believe the following excerpt from his opinion is overwhelmingly borne out by the ■record:
 

 “Each' Commissioner brought with him a list of prospective Jurors, both white and black, and they proceeded to fill the General Venire box with the names of prospective Jurors, until they reached the number of 300. When this figure was reached, they then selected the names of 20 persons for the Grand Jury Panel, each Commissioner suggesting names for each of the six wards in the Parish, so as to give each ward representation on the Grand Jury Panel, under the law. They then hunted among the 300 slips in the box for the names which they had selected for Grand Jury Service, and these slips were set aside and placed in the envelope required for that purpose. * * * The evidence in this record taken on the motion to quash, shows that the proceedings of the Jury "Commission were regular and legal in •every respect, and there was no prejudice, hostility or deliberate or systematic exclusion of negroes from jury service, solely on account of their race or color. The members of the Jury Commission made up their own lists, without suggestion from any outsiders, and the names of both whites and blacks were of persons whom the Jury Commissioners knew personally in their respective localities, and whom they believed possessed qualifications that would entitle them to serve as jurors.”
 

 But defendant’s counsel has laid great stress on the fact that among the 300 names tendered by the new commission as prospective jurors were to be found some seventy odd that had also appeared on the general venire list selected by the old commission and would have us deduce from this fact that the new commission fraudulently retained these names in the box, vitiating the proceedings under the holdings in the cases of State v. Love, 106 La. 658, 31 So. 289; State v. Avis, 145 La. 632, 82 So. 729; State v. Malone, 148 La. 288, 86 So. 800; and State v. Bain, 135 La. 776, 66 So. 196, therein cited.
 

 The cases of State v. Avis and State v. Love have no bearing on the issue raised here. In the former case the indictment was quashed for the reason that one of the witnesses viewing the proceedings of the jury commission was (contrary to the provisions of Article 178 of the Code of Criminal Procedure, then Act No. 58 of 1904) unable to'read and write the English language. In the latter the indictment was quashed for the reason that the jury commission drew the jury from a general venire box that lacked the required 300 names. It is true that in the cases of State v. Malone and State v. Bain the new jury commission supplemented the invalid list remaining in the box, instead of making up a new general venire list after the appointment of a new jury commissioner, but these decisions are not applicable to the case now under consideration for the reason that, in this case, it is conclusively shown the general venire box was purged by the removal and destruction of all of the old names remaining therein and that an entirely new set of names, submitted by
 
 *632
 
 the new commissioners and composed by them, was placed in the box. The clerk of court and four of the five commissioners (the fifth being confined to his bed on account of illness and unable to testify) all swore they destroyed all of the old slips remaining in the box and put in a complete new list of 300 names. We cannot, therefore, assume, as counsel would have us do, that these witnesses swore falsely, without proof to this effect.
 

 Under ordinary circumstances the questions raised in this motion would not merit any further consideration, but, this being a capital case and defendant’s counsel having argued so strenuously, both in brief and orally, that the defendant was discriminated against on account of his race and color, in-violation of the 14th Amendment to the Constitution of the United States and Section 2 of Article I of the 1921 Constitution of the State bf Louisiana under the holding in the case of Norris v. Alabama, 294 U.S. 587, 55 S.Ct. 579, 79 L.Ed. 1074, and more particularly in' violation of the decision of the United States Supreme Court in the case of Pierre v. State of Louisiana, 306 U.S. 354, 59 S.Ct. 536, 83 L.Ed. 757, we feel constrained to give the case further consideration.
 

 It is counsel’s contention that the Jury Commission, in placing only 52 negroes on the general venire list of 300, did not give Pierre the proper
 
 percentage
 
 of representation on the list, directly contrary to the finding of the United States Supreme Court that 49.3 percent of the population of St. John the Baptist Parish are negroes qualified to serve as jurors.
 

 In disposing of this issue the trial judge very aptly pointed out that “There is-no law in this State which fixes any proportion or percentage of whites and negroes for jury service, and the Supreme Court of the United States has never held that negroes are entitled to representation on Grand and petit juries, in proportion to the population as fixed by the preceding census of the United States.”
 

 The Supreme Court of the United States has held that “Whenever by any action of a state, whether through its Legislature, through its courts, or through its executive or administrative officers, all persons of the African race are excluded, solely because of their race or color, from serving as grand jurors in the criminal prosecution of a person of the African race, the equal protection of the laws is denied to him, contrary to the Fourteenth Amendment of the Constitution of the United States. * * *” Norris v. Alabama, supra [294 U.S. 587, 55 S.Ct. 580, 79 L.Ed. 1074], “But that rule does not entitle a person to be tried by a jury composed only of white, or only of black, or mixed persons, and while it is true that there must be no distinction in selecting the jury based on race or color, the jury commission should select persons whom they know to be competent, regardless of whether they are white or black, and if all but a few of the persons placed on the general venire list happen to be white, it will be presumed, in the absence of evidence to the contrary, that the list was so selected by the jury commission in a fair effort to select the best qualified persons and not with any
 
 *634
 
 view of discrimination on account of race or color.” State v. Gill, 186 La. 339, 172 So. 412, 415. See, also, State v. Turner, 133 La. 555, 63 So. 169; Commonwealth of Virginia v. Rives, 100 U.S. 313, 332, 25 L.Ed. 667; and Neal v. Delaware, 103 U.S. 370, 394, 26 L.Ed. 567.
 

 In the Rives case the defendant sought to have his case remoyed to the Circuit Court of the United States for the Western District of Virginia because of the state court’s refusal to so modify the jury venire, which was composed entirely of white persons, as to allow that one third thereof be composed of colored men. In disposing of that issue the Supreme Court of the United States said [100 U.S. 322, 25 L.Ed. 667]: “* * * the refusal of the court and of the counsel for the prosecution to allow a modification of the venire, by which one-third of the jury, or a portion of it, should be composed of persons of the petitioners’ own race,- [does not] amount to any denial of a right secured to them by any law providing for the equal civil rights of citizens of the United States.
 
 The privilege for which they moved,
 
 and which they also asked from the prosecution,
 
 was not a right given or secured to them, or to any person, by the law of the State, or by any act of Congress, or by the Fourteenth Amendment of the Constitution.
 
 It is a right to which every colored man is entitled, that, in the selection of jurors to pass upon his life, liberty, or property, there shall be no exclusion of his race, and no discrimination against them because of their color. But this is a different thing from the right which it is asserted was denied to the petitioners by the State court, viz. a right to have the jury composed in part of colored men.
 
 A mixed fury in a particular case is not essential to the equal protection of the laws, and the right to it is not given by any law of Virginia, or by any Federal statiite. It is not, therefore, guaranteed by the Fourteenth Amendment
 
 * * */> (italics and brackets ours.)
 

 In the later case of Neal v. Delaware, supra, the Supreme Court of the United States said: “We repeat what was said in that case [Commonwealth of Virginia v. Rives], that while a colored citizen, party to a trial involving his life, liberty, or property, cannot claim, as matter or right, that his. race shall have a representation on the jury, and while a mixed jury, in a particular case, is not within the meaning, of the Constitution, always or absolutely necessary to the equal protection of the laws, it is a right to which he is entitled, ‘that in the selection of jurors to pass upon his life, liberty, or property, there shall' be no exclusion of his race, and no discrimination against them, because of their color.” (Brackets ours.)
 

 It is true that in the Pierre case the United States Supreme Court did point out the percentage of negroes living in St. John the Baptist Parish (49.3 percent), and the percentage of those who could read and write, but the court did not hold, as contended by counsel for defendant, that the defendant is entitled to be tried by a jury composed of any fixed percentage of negroes. The decision was based primarily on the court’s finding that, by the uncontradicted testimony in the record (the state offered none to contravene same), the ac
 
 *636
 
 'Cused had “created a strong prima facie •showing that negroes had been systemati•cally excluded — because.of race — from the 'Grand Jury and the venire from which it was selected. * * *” [306 U.S. 354, 59 S.Ct. 540, 83 L.Ed. 757.] Pierre’s motion to quash the indictment in that case was levelled at both the grand and petit juries. The trial judge quashed the petit jury be■cause he was of the opinion defendant’s race had been discriminated against, but he refused to quash the grand jury (although both juries had been selected from the same venire list) because he did not feel that exclusion of negroes from grand juries violated the defendant’s constitutional rights, as an indictment was merely a presentment and not evidence of guilt. 'The United States Supreme Court, how■ever, reversing this opinion, stressed the fact that under the Louisiana Constitution ■of 1921, Article I, Section 9, it is provided that “no person shall be held to answer for ■capital crime unless on a presentment or indictment by a grand jury,” and concluded that “If petitioner’s evidence of such systematic exclusion of negroes from the general venire was sufficient to support the trial court’s action in quashing the Petit Jury drawn from that general venire, it necessarily follows that the indictment returned by a Grand Jury, selected from the ■same general venire, should also have been quashed.”
 

 The defendant’s second and third bills of exception, being based on the same grounds urged in the first, present nothing further for us to review.
 

 For the reasons assigned, the sentence and conviction appealed from are affirmed.
 

 McCALEB, J., did not participate.