801 So.2d 485 (2001)
Joseph JENKINS
v.
Edward BALDWIN, State of Louisiana, Lyle Trabeaux et al.
No. 2000-CA-0802.
Court of Appeal of Louisiana, Fourth Circuit.
August 29, 2001.
Rehearing Denied October 3, 2001.
*487 Mathew B. Collins, Jr., Dianne J. Marshall, New Orleans, LA, and Catrice A. *488 Johnson, Charles E. Cotton, New Orleans, LA, Counsel for Plaintiff/Appellee.
Annabelle H. Walker, Deputy City Attorney, Franz L. Zibilich, Chief Deputy City Attorney, Mavis S. Early, City Attorney, New Orleans, LA, Counsel for Defendant/Appellant.
Court composed of Chief Judge WILLIAM H. BYRNES, III, Judges STEVEN R. PLOTKIN, and MAX N. TOBIAS, Jr.
BYRNES, Chief Judge.
The City of New Orleans ("City") appeals a judgment in favor of the plaintiff, Joseph Oliver Jenkins, and against the City for damages for malicious prosecution, as well as intentional infliction of emotional distress, based on the claim that Jenkins was improperly convicted of murder and was improperly incarcerated for thirty (30) years. We reverse.

Facts
On Mardi Gras Day, March 5, 1957, around 4:00 p.m., a man named August During[1] was shot and killed on Canal Street near North Roman Street. After the shooting, Jenkins left. A few blocks away, Officer James Stevens and Officer Harold Woods apprehended and arrested Jenkins. The police submitted written statements from twelve witnesses and a police report to the District Attorney. According to the statements and police report, the victim, During, was in a group of eight people dressed as convicts who walked down Canal Street. At Canal and North Roman, Jenkins and During bumped into each other and then Jenkins backed into Canal Street. Both Jenkins and the victim had been drinking. Jenkins pulled a gun and shot several times, twice in the air and then at During, who died with two gunshot wounds in his chest. Two witnesses, Peggy and Albert Dupiere, stated that they saw the shooting from their car, that they were present when Jenkins was apprehended, and that at the time, Jenkins said that he shot the man but the man shot at him first. The police did not find a second weapon at the scene, and none of the other witnesses saw During with a gun.
At the police station, Jenkins told the officers that the victim had a gun, was in an automobile, and shot at him first. The victim's car was not found near the scene, but was located about fourteen blocks away.
Jenkins related that the police beat him in a room at the police station when he wouldn't sign a blank piece of paper. However, Jenkins did not present an allegation of police brutality in his petitions.
Jenkins stated that he carried a gun because he got into a fight with somebody at a dance the week before. Jenkins had a gun because "I was told that the party who threatened my life was looking for me with a butcher knife." Jenkins remarked that his gun was a .32 automatic that was not fully automatic. It had a "lemon squeeze" in the back. He said, "it will keep firing as long as you squeeze them both." In other words, the shooter does not have to pull the trigger each time he shoots, but the shooter must squeeze both parts of the trigger at once for the gun to go off.
Jenkins stated that he fired a couple of shots into the air to scare the victim, and then he tripped, firing two or three shots at the victim. Jenkins asserted that he was with several companions, but the witnesses told the police that Jenkins was by himself when the shooting occurred. The police report showed that the police tried to locate Jenkins' companions, but the *489 police were unsuccessful. The police interviewed individuals at Jenkins' residence. His common law wife said that she knew that Jenkins had a gun before she began living with him about a year before.
Jenkins' statements are conflicting. When interviewed on television by Bill Elder in 1986, Jenkins stated that he did not recall the events of the shooting incident from the time he left the bar two or three blocks away (before the incident) until he was in the police car (after he was apprehended). At his civil trial in 1999, Jenkins asserted that the group dressed like convicts locked hands and would not let him through. The other witnesses in the criminal trial stated that most of the group dressed as convicts were about a block away from During and his companion, Lyle Trabeaux, when the shooting occurred. Trabeaux had lagged behind with During but was still walking ahead of During away from Canal on North Roman.
Officer Woods stated that a few blocks from the scene of the shooting, after he received the complaint from a couple in a car, he jumped out of the patrol car. He fired two warning shots and yelled at Jenkins to halt. Jenkins continued to run with Officer Woods in pursuit. Officer Stevens followed against traffic in the patrol car. Officer Stevens testified that when he got out of the police car, Jenkins was pointing his gun at him. The officer stated: "I told him to drop the gun. He didn't drop it, so I pulled outI drew my weapon and I fired a shot into a fence behind him. And [Jenkins] dropped the weapon...." The police officers arrested Jenkins, put him into the patrol car, and returned to the scene of the shooting.
After a jury trial in June 1957, Jenkins was convicted of murder and on November 20, 1957, Jenkins was sentenced to death. His sentence was commuted to life imprisonment on June 26, 1976, and to eighty (80) years in January 1987.
Sometime in the 1980's, Eugene Morse, then a fireman in the New Orleans Fire Department, read a newspaper article by Bill Elder about the Jenkins case. The article discussed the attempt to overturn Jenkins' conviction because there were no blacks on the jury. Morse called Bill Elder, who interviewed him and others on television in September 1986. Bill Elder stated that an all white jury convicted Jenkins. The television interviews stressed that in Morse's opinion, Jenkins shot During in self-defense.
Jenkins was released on parole in 1987. He was granted a new trial on April 26, 1991, on the basis that he did not receive a fair trial. On August 30, 1991, the defense filed a motion to quash the indictment based on the claim that: "The composition of the grand jury which returned the indictment is unconstitutional by present standards in that blacks and women were systematically excluded from service on the grand jury."[2] Thereafter, the criminal *490 trial court granted the defendant's motion to quash the indictment on October 10, 1991.
Joseph Jenkins filed his civil suit in April 1992, against the Assistant District Attorney Edward Baldwin, Lyle Trabeaux, and the State of Louisiana, claiming that he had been wrongfully arrested, charged, convicted and incarcerated. Jenkins alleged that witnesses at his trial lied; that Officers Harold Woods and James Stevens hid and withheld evidence by refusing to take statements from witnesses favorable to the defense; and that his witnesses were sent home on the day of trial. Jenkins claimed that the officers and prosecutor hid from the jury evidence that he was acting in self-defense. Because of the witnesses' lies and hidden evidence, Jenkins asserted that he was wrongfully convicted of murder.
In his first amended petition, Jenkins added the City of New Orleans and Police Officer James Stevens as defendants. He claimed that the failure to properly investigate the charges and suppressing favorable evidence amounted to deliberate and intentional indifference to his rights. He accused Lyle Trabeaux of lying about how the incident took place in order to convict Jenkins.
In his second amending petition, Jenkins claimed damages on a continuing tort basis from the date of his arrest until the criminal proceeding became final in 1991.
*491 Jenkins filed another second amending petition to substitute the Estate of Edward Baldwin as a defendant, to add the Orleans Parish District Attorney's Office as the employer of Edward Baldwin, and to add an unnamed insurance company.
In his third amending petition, Jenkins asserted that the statute, limiting the liability of the State or any political subdivision, was unconstitutional. In his fifth amending petition, Jenkins added claims against the State for the acts of the District Attorney. He sought compensation for work he performed while incarcerated, and he claimed that La. R.S. 13:5108.2 B was unconstitutional. Another fifth amending petition filed in June 1994, added a claim of conspiracy to maliciously prosecute him and suppress evidence against Lyle Trabeaux, Edward Baldwin, James Stevens and other unknown individuals.
Jenkins filed a sixth amending petition in 1995, alleging the unconstitutionality of La. R.S. 13:5105, that denied the right to a jury trial against a political subdivision.
When Lyle Trabeaux filed an exception of prescription, Jenkins stated in his affidavit that he was not aware of the existence of the 1986 Bill ElderWWL tape until after he filed the civil lawsuit in April 1992, and his attorneys obtained the tape. However, Trabeaux submitted an exhibit: the May 30, 1990 minute entry in Jenkins' Orleans criminal case number 156-101(D). The minute entry showed that Jenkins saw the video tape in criminal court with his attorney during the May 30, 1990 hearing on Jenkins' motion for new trial.
At the time of Jenkins' civil trial, most of the defendants had been dismissed. The City and Officer James Stevens remained defendants at the bench trial in February 1999. On May 7, 1999, the trial court rendered judgment against the City and awarded Jenkins twelve million ($12,000,000) dollars in general damages, as well as six hundred fifty-eight thousand, one hundred fifty-two ($658,152.00) dollars in lost wages, together with legal interest from the date of judicial demand. The City's appeal followed.
On appeal the City contends that the trial court erred in: (1) holding the City liable for the plaintiff's conviction and incarceration; (2) refusing to admit the plaintiffs criminal trial transcript into evidence; (3) failing to assign comparative fault to the District Attorney; and (4) awarding excessive general damages.

Criminal Trial Transcript
Jenkins contends that the criminal trial transcript is inadmissible because no predicate was laid as required in Montgomery v. Breaux, 297 So.2d 185 (La. 1974). Jenkins maintains that the trial transcript of previous proceedings are not admissible. Pearce v. Stanford, 260 La. 1163, 258 So.2d 538 (La.1972). The testimony of the prior proceedings can only be considered for impeachment purposes and not for the truth of the matter asserted. City of New Orleans v. Hamilton, 602 So.2d 112 (La.App. 4 Cir.1992).
In the present civil case, the record shows that at the beginning of the civil trial, the plaintiff filed a motion in limine to exclude the City's witnesses and the criminal trial transcript from being admitted into evidence because the City had not filed a pretrial order. The City pointed out that nothing in the record showed a pretrial notice commanding a pretrial order was served on the parties. The parties agreed that the City had no surprise witnesses or exhibits. Counsel for the City related that possibly a representative from the Criminal Clerk's Office might be called as a witness to suggest that the trial transcript was in fact the trial transcript *492 for authenticity purposes and chain of custody.
After Jenkins presented his case-in-chief, the trial court ruled on the plaintiffs motion in limine, and at the same time, it denied the City's request to allow the criminal trial transcript into evidence. The trial court found that the criminal transcript was not relevant and that the City did not lay a foundation for admitting the criminal trial transcript into evidence in the civil trial. Although the City proffered the criminal trial transcript, the entire transcript is not in the record. Portions of the transcript were introduced for impeachment purposes.
The admissibility of evidence in a judge trial is different from the requirements of jury trials. State v. Myers, 584 So.2d 242 (1991), writ denied 588 So.2d 105 (La. 1991), certiorari denied sub nom. Myers v. Louisiana, 504 U.S. 912, 112 S.Ct. 1945, 118 L.Ed.2d 550 (1992); State v. Bertram, 511 So.2d 1171 (La.App. 4 Cir.1987), writ denied 517 So.2d 810 (La.1988). A judge, unlike a jury, by virtue of the judge's training and knowledge of the law is fully capable of disregarding any impropriety. State v. Babin, 93-1361 (La.App. 1 Cir. 5/20/94), 637 So.2d 814, writ denied, 94-1563 (La.10/28/94), 644 So.2d 649.
In Gibson v. State, 99-1730 (La.4/11/00), 758 So.2d 782, the Louisiana Supreme Court reversed this Court's finding that affirmed the award in the civil suit after Gibson's conviction for first-degree murder was overturned. This Court ordered the criminal trial transcript, and it became part of the record on the civil appeal.
In State v. Honeycutt, 29,596 (La.App. 2 Cir. 8/20/97), 698 So.2d 718, 720, the Second Circuit stated:
La. C.E. art. 902, which relates to self-authentication of public documents, states in pertinent part:
Extrinsic evidence of authenticity as a condition precedent to admissibility is not required with respect to the following:
* * *
(b) Certified Louisiana public documents. A purported record, book, paper, or other document of the State of Louisiana, or of a department, board, or agency thereof or of a political subdivision of the state or department, board, or agency of such a subdivision when certified as being the original by an officer or employee who identifies his official position and who either has custody of the document or who is otherwise authorized to make such a certification.
La. C.E. art. 904, which governs the rules for self-authentication of copies of public documents, states:
When an original public document is deemed authentic without proof by extrinsic evidence as provided in Article 902(1), (2) or (3), a purported copy of the document also shall be deemed authentic when certified as true or correct by the custodian or other person authorized to make that certification, by certificate complying with Article 902(1), (2), or (3)[.]
Similarly, La. C.E. art. 1005 authorizes the use of certified copies to make the contents of a public record admissible when the copy is certified in compliance with La. C.E. art. 902 or is testified to as being correct by a witness who has compared it to the original.
La. C.E. art. 905 provides for the self-authentication of documents authorized by law to be recorded or filed and actually recorded or filed in a public office. La. C.E. art. 905 states:
Art. 905. Self-authentication of other public records

*493 A. Self-authentication. Extrinsic evidence of authenticity as a condition precedent to admissibility is not required with respect to a document purporting to be a document authorized by law to be recorded or filed and actually recorded or filed in a public office, including data compilations in any form, when it is certified as being true or correct by the custodian or other person authorized to make the certification, by certificate complying with Article 902(1), (2), or (3) and when, by statute, it is made to be presumptively or prima facie genuine or authentic.
B. Copy of original document described in Paragraph A. A document which purports to be a copy of an original document described in Paragraph A shall be deemed as authentic as the original when certified as true or correct by the custodian or other person authorized to make the certification, by certificate complying with Article 902(1), (2), or (3).
C. Copy of other public records. A document which purports to be a copy of an original document, other than a document described in Paragraph A, which is recorded or filed in a public office, including a data compilation in any form, shall be prima facie evidence that the copy accurately reflects the contents of the document as true or correct by the custodian or other person authorized to make the certification, by certificate complying with Article 902(1), (2), or (3).
In State v. Moity, 159 So.2d 149, 245 La. 546 (La.1963), reversed on other grounds sub nom. Moity v. Louisiana, 379 U.S. 201, 85 S.Ct. 323, 13 L.Ed.2d 339 (1964), the Louisiana Supreme Court held that judicial proceedings filed in state and federal courts, as well as a petition filed in another case before the Louisiana Supreme Court, were admissible in a defamation suit provided that the documents were properly certified or found to be certified as true or correct by the custodian or other person authorized to make that certification.
In the present case, considering that the City did not receive a notice requiring a pretrial order, the City could not be held to follow the pretrial order. The criminal trial transcript is relevant to determine whether there was malicious prosecution, and whether any failure to disclose exculpatory evidence is the fault of the City or the State. The transcript is not being used to show the truth of the matter, but to explain the accompanying circumstances to determine whether there was sufficient evidence available concerning Jenkins' self-defense claim; whether Morse's testimony is cumulative; whether there is a finding of reversible or harmless error in the omission of Morse's testimony; and whether any error should be imputed to the City.
Further, the transcript of Jenkins' criminal trial was part of the record on criminal appeal. It was filed into the record in the public office of the criminal district court and the Louisiana Supreme Court, and therefore was admissible in the civil trial if properly authenticated under La. C.E. arts. 901-905. The City was prepared to call as a witness, a representative from the Criminal Clerk's Office to suggest that the trial transcript was in fact the trial transcript for authenticity purposes and chain of custody. Without the proffer, we cannot determine if the criminal trial transcript was properly authenticated. However, portions of the criminal transcript were introduced into the civil trial for impeachment purposes. Reference to the portions of the criminal trial transcript in the record is proper.

Standard of Review
A court of appeal may not set aside a trial court's finding of fact in the *494 absence of "manifest error" or unless it is "clearly wrong." When there is a conflict in the testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed on review, even though the appellate court may feel that its own evaluations and inferences are as reasonable. Where there are two permissible views of the evidence, the factfinder's choice between them cannot be manifestly erroneous or clearly wrong. Appellate courts must constantly have in mind that their initial review function is not to decide factual issues de novo. When findings are based on determinations regarding the credibility of witnesses, the manifest errorclearly wrong standard demands great deference to the trier of fact's findings; for only the factfinder can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener's understanding and belief in what is said.
However, where documents or objective evidence so contradict a witness's story, or the story itself is so internally inconsistent or implausible on its face, that a reasonable fact-finder would not credit the witness's story, the court of appeal may well find manifest error or clear wrongness even in a finding purportedly based upon a credibility determination. Where such factors are not present, and a fact-finder's finding is based on its decision to credit the testimony of one or more witnesses, that finding can virtually never be manifestly erroneous or clearly wrong." Rosell v. ESCO, 549 So.2d 840, 844-845 (La.1989). See also, Hill v. Morehouse Parish Police Jury, 95-1100 (La.1/16/96), p. 4, 666 So.2d 612, 614; Ferrell v. Fireman's Fund Ins. Co., 94-1252 (La.2/20/95), 650 So.2d 742, 745; Stobart v. State through Dept. of Transp. and Development, 617 So.2d 880 (La.1993); Arceneaux v. Domingue, 365 So.2d 1330 (La.1978).
Of course, where trial court legal errors have tainted the fact finding process, the judgment is not reviewed under the manifest error standard and, if the record is complete, the appellate court may make a de novo review of the record and determine the preponderance of the evidence. Rosell v. ESCO, supra, 549 So.2d at 844 fn. 2 (La.1989); Gonzales v. Xerox Corp., 320 So.2d 163 (La.1975).
Before a fact-finder's verdict may be reversed, the reviewing court must find from the record that a reasonable factual basis does not exist for the verdict, and that the record establishes the verdict is manifestly wrong. Lewis v. State, Through Dept. of Transp. and Development, 94-2370 (La.4/21/95), 654 So.2d 311, 314; Stobart v. State through Dept. of Transp. and Development, supra. Although we accord deference to the factfinder, we are cognizant of our constitutional duty to review facts,[3] not to decide if we, as a reviewing court, would have found the facts differently, but to determine whether the trial court's verdict was manifestly erroneous, clearly wrong based on the evidence, or clearly without evidentiary support. Ambrose v. New Orleans Police Department Ambulance Service, 93-3099 (La.7/5/94), 639 So.2d 216, 221; Ferrell v. Fireman's Fund Ins. Co., supra.

Malicious Prosecution
Jenkins contends that the City is liable for malicious prosecution because police investigators did not give him the information about the witness Morse, who could have given him a defense of self-defense. At his trial in 1957, Jenkins raised no claim of self-defense. He now asserts that a self-defense claim would concomitantly *495 establish a lack of probable cause for his arrest, defeat the charge of murder, and defeat the death penalty. In its reasons for judgment in Jenkins' civil case, the trial court stated that: "Joseph Jenkins was subsequently charged with first degree murder." At the time of the shooting of During, the Louisiana statute did not recognize degrees of murder. The laws and jurisprudence at the time of During's death were different than today.[4] We *496 therefore, in determining whether Jenkins was maliciously prosecuted, must determine whether the action and inaction of the police in 1957 constituted conduct that entitles Jenkins to prevail in his present suit.
The City argues that the City is not liable for malicious prosecution of the plaintiff. The City claims that the trial court erred in finding that a police officer's failure to take the name and address, as well as taking the statement of a potential witness, created a presumption that the officer's inaction was deliberate and malicious and that the police had no probable cause to pursue a murder charge against Jenkins.
If a person is arrested pursuant to a valid warrant, there is no false arrest and no false imprisonment. Rodriguez v. Deen, 33-308 (La.App. 2 Cir. 5/10/00), 759 So.2d 1032, writ denied, XXXX-XXXX (La.6/23/00), 765 So.2d 1049. Actions for malicious prosecution have never been favored, and hence, in order to sustain them, a clear case must be established. Kelly v. West Cash & Carry Bldg. Materials Store, 99-0102 (La.App. 4 Cir. 10/20/99), 745 So.2d 743. The elements which must be established to prevail in a malicious prosecution action are the following: (1) the commencement or continuance of an original criminal or civil judicial proceeding; (2) its legal causation by the present defendant in the original proceeding; (3) its bona fide termination in favor of the present plaintiff; (4) the absence of probable cause for the original proceeding; (5) the presence of malice therein; and (6) damage resulting to the plaintiff. Jones v. Soileau, 448 So.2d 1268 (La.1984); Plessy v. Hayes Motor Co., Inc., 31-974 (La.App. 2 Cir. 6/16/99), 742 So.2d 934. In civil cases, probable cause is a standard of proof employed in defense of malicious prosecution claims to determine if a party was justified in filing criminal charges or civil lawsuits. State v. One (1) 1991 Pontiac Trans Sport Van, Vin # 1GMCU06D3MT208532, 98-64 (La.App. 5 Cir. 7/9/98), 716 So.2d 446. Police need not investigate all possible defenses or negate every possible explanation in determining whether probable cause to arrest exists. State v. Phillips, 347 So.2d 206, 209 (La.1977). Damage awards in malicious prosecution suits should be compensatory only. Jones v. Soileau, supra.
In the present case, Jenkins states that he is not contesting that there was probable cause for his arrest. Jenkins claims that the City is liable for malicious prosecution because the policeman did not take the name and address or interview the witness, Eugene Morse, who later stated that at the time of the shooting, he told a police officer that Jenkins was acting in self-defense. Jenkins claims that because the policeman did not give the information to the prosecutors, the police are responsible for malicious prosecution.
Jenkins refers to Sanders v. English, 950 F.2d 1152 (5 Cir.1992), noting that deliberately concealing or deliberately failing *497 to disclose exculpatory evidence, like maliciously tendering false information, can form the basis for an inference that the police officer acted with malice in initiating and maintaining the prosecution, for the purpose of an arrestee's malicious prosecution action. A police officer who procures a prosecution by lying to the prosecutor or to the grand jury can be sued for the consequences of the prosecution. Mahoney v. Kesery, 976 F.2d 1054, 1061 (7 Cir.1992).
In State v. Bailey, 261 La. 831, 844, 261 So.2d 583, 588 (La.1972), the Louisiana Supreme Court stated:
In requesting all favorable or exculpatory material, the defendant relies on the United States Supreme Court's decision, Brady v. State, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), for the proposition that "* * * the suppression by the prosecution of evidence favorable to the accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution."
Brady, rendered in 1963, was not in effect at the time of Jenkins' criminal trial and does not apply. Further, to be recognized as malicious prosecution, cases after Brady show that the withholding of evidence favorable to the defense must be done intentionally and deliberately with malice.
In State v. Gladden, 260 La. 735, 753, 257 So.2d 388, 394 (La.1972), appeal dismissed, certiorari denied sub nom. Gladden v. Louisiana, 410 U.S. 920, 93 S.Ct. 1377, 35 L.Ed.2d 581 (1973), the Louisiana Supreme Court stated: "Implicit in the Brady holding is the requirement that there be `known' perjured testimony used by the State or a deliberate deception; or that the State, although not soliciting false evidence, allows it to go uncorrected when it appears."
A police officer who allegedly made material omissions and false statements in an affidavit underlying an arrest does not engage in false imprisonment, malicious prosecution, or abuse of process, as to arrestees, absent evidence of malice or ulterior motive. Morin v. Caire, 77 F.3d 116 (5 Cir.1996). Under Louisiana law, the torts of false arrest and malicious prosecution both require malice as an essential element. Id. Malice may be inferred from a lack of probable cause, or from a finding that the defendant acted in reckless disregard of the other person's rights. Miller v. East Baton Rouge Parish Sheriff's Dep't., 511 So.2d 446, 453 (La.1987).
The duties of police officers to conduct an adequate investigation into crimes and determine probable cause to arrest, do not include the risk of liability for consequences as conviction and lengthy incarceration, absent evidence of malice or deliberate intent to suppress exculpatory evidence or otherwise mislead the court.
At issue in the present case is whether the trial court correctly found that the City acted with malice and deliberate intent to suppress the exculpatory evidence.
Jenkins asserts that the prosecutor, Edward Baldwin, indicated that with Eugene Morse's testimony, there would have been no probable cause to prosecute Jenkins for murder. Baldwin stated:
This is the kind of case that should make a prosecutor think. That this could have happened, I would have felt perfectly awful to know a man went to the chair perhaps he should not have, and I had a part in it.
Jenkins claims that the statement indicates that the prosecutor, Edwin Baldwin, would have regretted having a part in *498 sentencing a man to the chair when it might not have been warranted. However, the statement also can be understood to show that Baldwin may have questioned the death penalty but it does not indicate that the charge of murder was improper. There is no showing that Baldwin believed that the policeman's failure to obtain the information from Morse was done deliberately or maliciously to hurt Jenkins' case.
In Gibson v. State, supra, where the Louisiana Supreme Court reversed this Court's award in the civil suit, Gibson had been granted a new trial based on the failure of the District Attorney to furnish Brady material before Gibson's first degree murder trial. The District Attorney did not provide the defense with the supplemental police report that detailed the conflicting stories and alibi that Lloyd West, the only witness, provided the police before he confessed and implicated Gibson in the murder.[5] The police did not check on the arrestee's alleged alibi.
In the present case, Eugene Morse stated in his deposition dated March 13, 1992, that he saw the incident from his car on Canal Street. Although Morse did not see During throw a beer can, Morse saw a full beer can coming from the victim in Jenkins' direction, and the beer can hit Morse's car. The victim, During, continued to advance with clenched fists after Jenkins fired two warning shots into the air. Morse testified that the victim "asked for what he got" by failing to retreat. Morse stated that after Jenkins fired two shots overhead, Jenkins backed up where the streetcars passed on the neutral ground on Canal Street. Morse said that Jenkins "sort of like slipped or tripped, or something, when he did[,] he brought the gun down and fired several shots into the white man." Morse agreed that the victim, During, did not look as if he had a weapon.
The police report of the incident stated that: "The Negro backed into Canal Street about twelve feet, when he, the *499 Negro, pulled an automatic pistol from inside his jacket with his right hand.... This Negro appeared to fire twice in the air, then shot once at Durning, hitting him, continued to fire and Durning fell to the ground."
Eugene Joseph Didier testified that he was in his car at the traffic light at Canal and Roman when he saw "the man dressed as a convict [During] was walking toward the man in the black jacket [Jenkins] when the shots occurred." Didier saw During moving forward with his hands raised, and Jenkins was moving away from During. Albert Dupier was with his wife in their car, waiting at the traffic light at Canal and Roman. Dupier agreed that During was walking toward Jenkins.
The information that Jenkins was backing up when he shot into the air and then shot at During was in the police report. It is unknown if Jenkins' criminal attorney had access to the police report; however, the prosecutor, rather than the police, would have been responsible for not giving Jenkins' criminal attorney the police report and statements of the twelve witnesses listed in the report. Jenkins' attorney could have raised the defense of justified homicide but used the defense of Jenkins' insanity at the time of the shooting.[6] Morse's testimony that During was an aggressor may have affected the jury's murder conviction and/or may have been a mitigating circumstance that the jury could have considered in determining whether to give Jenkins the death penalty. Jenkins asserts that he suffered from being on death row with the fear of execution for many years before his sentence was commuted to life imprisonment in 1976.
At the time of Jenkins' criminal trial, the jury had the absolute right to qualify their verdict in a homicide case by adding "without capital punishment," without disregarding their oaths, though there were no extenuating circumstances. State v. Bacon, 138 La. 654, 70 So. 572 (La.1916). Although the penalty prescribed by statute for an offense was death, a verdict, in such a case, of "Guilty without capital punishment" was not the equivalent to an acquittal, in view of Acts 1855, p. 154, § 25, providing that, in all cases where the punishment pronounced by law is death, it should be lawful for the jury to qualify their verdict by adding thereto "without capital punishment." State v. Rohfrischt, 12 La.Ann. 382 (La.1857).
The issue remains as to whether the police maliciously and purposefully withheld the information of the existence of the witness, Eugene Morse, to hurt Jenkins' case.
Jenkins argues that the City is responsible for the acts of their police officers during the course and scope of their employment. This involved the police officers' intentional failure to investigate.
In his deposition for the civil trial, Morse provided conflicting testimony as to what he told the police when he came back to the crime scene after trying unsuccessfully to follow Jenkins on the day of the shooting. Morse stated:
By this time, they had police at the scene and I talked to the police and I told them that I had witnessed it, and I told them this man was coming after him with his fist and threw a full can of beer at him and I say as far as I'm concerned this man asked for what he got, something like that is what I said and the policeman said, "okay, we'll get *500 a statement from you later[;"] he says ["]I know where you live[;"] he said ["]you live on Palmyra Street[";] and I said "yeah!" He said okay[,"]we'll pass there and get a statement from you[;"] so I left.
Thereafter, in his deposition, Morse also related:
As far as what I told the policeman if I'm not mistaken, I told him that I felt that [Jenkins] was either protecting himself or self defense.
During his deposition, Morse later answered the following question:
Q. And you told them [the police] exactly what you had seen?
A. No. I told them a quick version. I just said that, you know, I was a witness and that I saw, you know. I don't know if I told them the black man was defending himself or self defense, or something like that. [Emphasis added.]
Morse's testimony is conflicting, and it is uncertain if Morse told the officer that Jenkins was acting in self-defense.
Morse did not give the policeman his name. The policeman said he knew Morse, and that Morse lived on Palmyra. The officer said he would get Morse's statement later. The record shows that the police asked several of the witnesses to give their statements the next day.
Morse could not identify the police officer or officers to whom he spoke. Morse stated, "He was a very nice policeman to the best of my knowledge." Morse did not think it was strange that the police never came to his house to take his statement. Morse explained, "I really don't know. I just never saw him. So evidently that's why he didn't take [Morse's statement]. I didn't see him, you know, I didn't know if he transferred to a different district or different beat, or different route, or what but I just never seen him."
It is uncertain whether the police attempted but were unable to contact Morse because he was never at home or was not at home at the various times that the police visited his home. The police need make only reasonable efforts, and need not investigate all possible defenses to determine probable cause for the arrest. See Gibson v. State, supra, 758 So.2d at 789. In the present case, this Court is not convinced that the police purposefully did not obtain Morse's statement in reckless disregard of Jenkins' rights. From Morse's testimony, although the police officer failed to take Morse's name, address, and statement, there is no showing that this failure was done deliberately and intentionally to suppress exculpatory evidence or sabotage a potential defense by Jenkins.
When Morse went to court on the day of Jenkins' criminal trial, Morse spoke to someone in the courtroom and told that person that Morse was a witness. Morse thought the person appeared to be a "clerk," who told Morse that his name was not on the witness list and they would not need him. The "clerk" did not refer him to the defense counsel. The City would not be responsible for the "clerk's" actions where that person's status is unknown. There is no showing that the "clerk's" actions were done with malice and deliberate intent to harm Jenkin's case.
The civil trial court's determination that the City was liable for malicious prosecution is clearly wrong. Any emotional distress that Jenkins experienced would have been an element of damage arising out of his claims for malicious prosecution. Kelly v. West Cash & Carry Bldg. Materials Store, 99-0102 (La.App. 4 Cir. 10/20/99), 745 So.2d 743. Jenkins' emotional distress does not give rise to a cause of action *501 separate and apart from his claims for malicious prosecution. Therefore, there is no need to consider Jenkins' claim for intentional infliction of emotional distress separately. Id. A finding of no malicious prosecution and no liability on the part of the City pretermits a review of the City's remaining claims based on the State's comparative negligence and an excessive damage award.
Accordingly, the civil trial court's judgment against the City is reversed.
REVERSED.
NOTES
[1] In the record the victim's name is spelled as "During" as well as "Durning."
[2] In Jenkins' 1958 criminal appeal, the Louisiana Supreme Court reviewed the issue, stating:

Contending that the grand jury and the petit jury venire were illegally drawn, (FN5) counsel for defendant reserved Bill of Exceptions No. 2 to the trial judge's denial of defendant's demurrer and motion to quash the indictment, the grand jury panel and the grand jury itself, and Bill No. 3 to the judge's denial of defendant's motion to quash the petit jury venire. Counsel for the defense further alleges that members of the accused's race were systematically excluded from the grand jury.
The trial judge in his per curiam, disposing of these two exceptions, points out that at the time of the drawing the jury wheel contained 469 names, left from the preceding months, to which the commissioners added 900 names, making a grand total of 1,369 names. The jury commissioners then drew 1,050 names which were arranged in stacks of 25 names each. Five stacks of 25 names were then submitted to the Judge of Section `D', from which list the grand jury of twelve was selected, which returned the indictment against the defendant. The remaining stacks were allotted to the various sections of the criminal district court to serve on petit juries.
From the foregoing it is clear that there was no violation of any of the defendant's rights under Sections 15:194-196 of the Revised Statutes, and, furthermore, Section 15:203 specifically provides that `it shall not be sufficient cause to challenge the venire selected for any session of the court or portion thereof or for service at any time in any parish or district of this state, or to set aside the venire, * * * because of any * * * defect or irregularity in the manner of selecting the jury, or in the composition, summoning or proceedings of the jury commission, unless some fraud has been practiced or some great wrong committed that would work irreparable injury'. See State v. Foster, 32 La.Ann. 34; State v. Aspara, 113 La. 940, 37 So. 883; State v. Brantley, 175 La. 192, 143 So. 46; State v. Bussa, 176 La. 87, 145 So. 276; State v. Murphy, 234 La. 909, 102 So.2d 61, certiorari denied 357 U.S. 930, 78 S.Ct. 1376, 2 L.Ed.2d 1373. No allegation of fraud was made, and there was no showing that a great wrong working irreparable injury had been committed.
Counsel for defendant's contention that there was a systematic exclusion of members of the colored race from the grand jury is equally without merit. A review of the record discloses that there is no evidence to support this contention, which is based primarily on counsel's assumption, as stated in his brief, that `the percentage of Negroes to white is almost one half; yet only three Negroes served on the grand jury which indicted the defendant and not one Negro was on the petit jury which tried him. Systematic exclusion is the only reason.'
Although counsel for the defense did offer some evidence to show the number of Negroes in New Orleans who belong to the learned professions as well as the number of businessmen who are Negroes, there is not a scintilla of evidence as to the percentage of colored and white people qualified to serve as jurors. See State v. Pierre, 198 La. 619, 3 So.2d 895, certiorari denied 314 U.S. 676, 62 S.Ct. 186, 86 L.Ed. 541; State v. Fletcher, 236 La. 40, 106 So.2d 709. While it is true that only three Negroes served on the grand jury that indicted the defendant, as pointed out by the trial judge in his per curiam, 10-12 Negroes were members of the petit jury venire and were excused, [n]ot on account of their race, but because every single one stated on the voir dire examination that he entertained conscientious scruples against the infliction of capital punishment.
State v. Jenkins, 107 So.2d 632, 635-636, 236 La. 256, 264-266 (La.1958).
[3] See, LSA-Const. Art. 5, section 10(B).
[4] Murder and Self-Defense in 1957

Under the Historical and Statutory Notes, the comment under the 1973 amendment to La. R.S. 14:30 states: "Crimes committed before this time shall be governed by the law existing at the time the crime was committed." At the time of the shooting of August During in 1957, La. R.S. 14:30 provided in pertinent part:
Murder is the killing of a human being:
(1) When the offender has a specific intent to kill or to inflict great bodily harm; or
(2) When the offender is engaged in the perpetration or attempted perpetration of aggravated arson, aggravated burglary, aggravated kidnapping, aggravated rape, armed robbery, or simple robbery, even though he has not intent to kill.
Whoever commits the crime of murder shall be punished by death.
The Reporter's Comments state that:
The former Louisiana statute did not recognize degrees of murder.
R.S. of 1870, § 785; State v. Carricut, 157 La. 140, 102 So. 98 (1924).... [Emphasis added.]
* * *
The Louisiana Legislature has never defined murder. By express mandate of the Crimes Act of 1805, courts have looked to the common law for its definition. State v. Mullen, 14 La.Ann. 570 (1859); State v. Robinson, 143 La. 543, 78 So. 933 (1918).
* * *
The first subdivision of this section includes all those homicides where the courts have found "express malice" under the old common-law definition. "Express malice" has generally been defined as meaning an actual intent to kill. State v. Mullen, 14 La.Ann. 570 (1859); State v. Robinson, 143 La. 543, 78 So. 933 (1918).
* * *
... Intent to inflict great bodily harm has also been held to satisfy the "malice aforethought" requirement. State v. Hoover, 20 N.C. 500, 34 Am.Dec. 383 (1839); State v. Morrison, 49 W.Va. 210, 38 S.E. 481 (1901), State v. Moynihan, 93 N.J.L. 253, 106 A. 817 (1919).
La. R.S. 14:19 provides:
§ 19. Use of force or violence in defense
The use of force or violence upon the person of another is justifiable, when committed for the purpose of preventing a forcible offense against the person or a forcible offense or trespass against property in a person's lawful possession; provided that the force or violence used must be reasonable and apparently necessary to prevent such offense, and that this article shall not apply where the force or violence results in a homicide. [Emphasis added.]
This statute was in effect in 1957 at the time that During was shot.
In 1957, La. R.S. 14:20 provided:
§ 20. Justifiable homicide
A homicide is justifiable:
(1) When committed in self-defense by one who reasonably believes that he is in imminent danger of losing his life or receiving great bodily harm and that the killing is necessary to save himself from that danger.
(2) When committed for the purpose of preventing a violent or forcible felony involving danger to life or of great bodily harm by one who reasonably believes that such an offense is about to be committed and that such action is necessary for its prevention. The circumstances must be sufficient to excite the fear of a reasonable person that there would be serious danger to his own life or person if he attempted to prevent the felony without the killing.
(3) When committed against a person whom one reasonably believes to be likely to use any unlawful force against a person present in a dwelling or a place of business while committing or attempting to commit a burglary or robbery of such dwelling or business. The homicide shall be justifiable even though the person does not retreat from the encounter.
(4) When committed by a person lawfully inside a dwelling or a place of business against a person who is attempting to make an unlawful entry into the dwelling or place of business, or who has made an unlawful entry into the dwelling or place of business, and the person committing the homicide reasonably believes that the use of deadly force is necessary to prevent the entry or to compel the intruder to leave the premises. The homicide shall be justifiable even though the person committing the homicide does not retreat from the encounter.
La. R.S. 14:20(1) applies to the present case. Section (1) has not been changed. The Reporter's Comments state:
It is intended that force or violence may be used only in protection of one's physical person or property. It has generally been held that mere insulting words will not justify an assault. Wharton, Criminal Law (12th ed. 1932), 1109, § 817....
[5] Gibson was convicted and received a life sentence. In 1985, West signed an affidavit recanting his prior testimony. West swore that he lied at Gibson's criminal trial and falsely accused Gibson to avoid receiving the death penalty. In 1992, Gibson filed an application for post conviction relief, and for the first time, revealed West's June 3, 1985 affidavit. Three hearings were held, and on February 16, 1993, West for the first time named another individual as the trigger-man. West, the sole witness testifying against Gibson, stated that he had not implicated another as the trigger-man because the police beat him into submission of a statement implicating Gibson.

After Gibson had been granted a new criminal trial because of the district attorney's failure to provide the defense with the Brady material, the State entered a nolle prosequi without the testimony of its sole witness, West. Gibson sued in civil court to recover for false arrest, false imprisonment and malicious prosecution.
In the civil appeal, this Court affirmed the jury verdict that found that the City did not have probable cause to arrest Gibson. The civil trial court found that the City was 90% at fault and West was 10% at fault. This Court amended the judgment, also allocating 45 percent of fault to the State, which was dismissed because of its statutory immunity.
However, the Louisiana Supreme Court reversed, finding that the second perpetrator, West's confession and statement implicating the arrestee, Gibson, provided probable cause for the police to arrest Gibson for murdering a taxi driver in 1968, even though a nolle prosequi was granted following post-conviction relief; a police report noted the need to question a person other than the arrestee, Gibson; reports did not mention two suspects; no physical evidence existed; the perpetrator was a felon; and the police did not check out the arrestee, Gibson's alleged alibi. The Louisiana Supreme Court held that the police had probable cause for an arrest, and on rehearing, that the trial court improperly credited the perpetrator, West's recantation, alleging that the police beat West into accusing an innocent person.
[6] At the civil trial, Jasper Pharr was accepted as an expert in criminal law, and he testified on behalf of Jenkins. Pharr noted that under the law in 1957, Jenkins could have simultaneously presented a dual defense of not guilty by reason of insanity and self-defense.